Laura J. CARLSON, Respondent,

v.

Oral A. OLSON, Appellant.

No. 47099.

Supreme Court of Minnesota.

May 13, 1977.

**250**

Arthur Chapman & Michaelson and Lindsay G. Arthur, Jr., Minneapolis, for appellant.

John P. Weber, Grand Rapids, for respondent.

Heard before ROGOSHESKE, KELLY and YETKA, JJ., and considered and decided by the court en banc.

YETKA, Justice.

The respondent brought an action to partition the real and personal property accumulated during a 21-year period when the parties lived together without being married, but holding themselves out to the public as in fact married. The District Court, Itasca County, allowed the partition and allotted a one-half interest in the property to each party. The appellant appeals the order of the trial court so finding. We affirm.

This appeal raises the issue of the assertion of property rights based on nonmarital domestic relationships entered into since the prospective abolition of the doctrine of common-law marriage in Minnesota in 1941.

The appellant Oral Olson and the respondent Laura Carlson began to live together as husband and wife in October of 1955. At the time she was 22, he was 31. They lived together for 21 years, raised a son to majority, and acquired a modest home and some personal property. They did not, however, ever legally marry, although they held themselves out to neighbors, friends, relatives, and the public as husband and wife. During the relationship she did not work outside the home. In 1974, differences arose between the parties. She no longer wanted to reside with him and desired a share of the property. To accomplish this, she brought an action to partition their real and personal property.

The parties' home was purchased in August of 1959. The appellant supplied the $900 down payment. Both parties executed a mortgage in the sum of $16,000. The deed listed them as "husband and wife" and as joint tenants. During their cohabitation he supplied all of the actual monies for the acquisition and improvement of the real estate, the personal property located thereon and the personal effects of the parties, with the exception of $1,000 supplied by her mother for a remodeling project. The present value of the real estate is approximately $40,000, less a mortgage of $11,628.64. Personal property includes furniture, furnishings, an automobile, a boat, motor, and trailer, and other miscellaneous items. Except for the mortgage, the parties are debt free. Both are now employed and self-sufficient. In response to the action for partition, the appellant counterclaimed for 17 years rent at $200 a month, $20,000 for improvements to the property, a judgment that he was the fee owner of the real estate, and ejectment of her from the real estate.

The trial court allowed the action for partition and held the commencement of the action effected a severance of an existing joint tenancy in the real estate and existing personal property. Each party was allotted a 50-percent interest. Although the appellant claimed a credit for the value of the improvements on the property which were paid for with his earnings, the trial court held the entire half share of the property constituted an irrevocable gift to the

respondent in consideration for the wifely and motherly services she performed during the period of their cohabitation.

■ The doctrine of common-law marriage would have covered the parties here;[1] however, its demise as a legal entity left a void and necessitates the creative application of traditional common-law and equitable principles to this situation. The elimination of common-law marriage obviously did not eliminate the institution, but only the rules which must be applied to it.

The elimination of common-law marriage generally left the parties open to the possible application of three legal doctrines:

"First, cohabitation between the parties to an express or implied contract might serve to render the contract illegal and, as a consequence, unenforceable.

"Second, doctrines generally applicable to arm's length business transactions were consulted, rather than those ordinarily used in noncommercial contexts.

"Third, courts refused to assign any economic value to the granting of personal services." See, Bruch, *Property Rights of Defacto Spouses Including Thoughts on the Value of Homemakers' Services,* 10 Family Law Quarterly 101, 106.

See, generally, id.; Weitzman, *Legal Regulation of Marriage: Tradition and Change,* 62 Calif.L.Rev. 1169.

By express acknowledgment or by necessary implication the arguments advanced by the parties in the instant case center on these three points. The appellant in effect argues all three. He argues the parties should be left as the court found them, in effect, as "pari delicto" (point 1), and places principal reliance on the application of market-place concepts to interpersonal dealings (point 2), and not placing an economic value on the personal services rendered by a de facto spouse (point 3). The argument is advanced that the cohabitation between the parties should not be a factor in the applica-

tion of real property principles (point 2), and that the services by the respondent were rendered gratuitously (point 3). The appellant contends the trial court erred in applying more than the bare rules of real property to the parties. The appellant claims the cohabitation of the parties is irrelevant and that the proceeding be resolved solely pursuant to the law of real property, without any reference to the apparent marriage. Accordingly, it is his position that the respective interest of each party is determined by comparing the amount paid by each to the entire sum which was the consideration for the property. In particular, the appellant assails the finding by the trial court that the respondent's contributions or services were equal in value to the contributions of the appellant.

On the other hand, the respondent argues that "[t]he instant case cannot be resolved simply by the laws of real property as it would with strangers" (point 2), and that the respondent should be able to recover the value of her services (point 3). Accordingly, she argues that the law of real property alone is insufficient to resolve the dispute in an equitable manner and that the cohabitation should be acknowledged as affecting the ultimate distribution of property.

The resolution of these three areas of general dispute into a consistent weave has been a difficult one for the courts for many years. See, Evans, *Property Interests Arising from Quasi-Marital Relations,* 9 Cornell L.Q. 246; Annotation, 31 A.L.R.2d 1255. The Minnesota law following the prospective abolition of common-law marriages offers few guidelines. One of the few cases to involve the question was *Baker v. Baker,* 222 Minn. 169, 23 N.W.2d 582 (1946). In that case the plaintiff brought an action claiming to be the common-law wife of the defendant and asked for a divorce and division of property. The plaintiff claimed a

1. Only common-law marriages contracted on or before April 26, 1941 are recognized as valid. Laws 1941, c. 459; *Baker v. Baker,* 222 Minn. 169, 23 N.W.2d 582 (1946). This requirement is currently codified in Minn.St. 517.01. For a

good general discussion of common-law marriage in Minnesota prior to the statute, see Billig & Lynch, *Common-Law Marriage in Minnesota: A problem in Social Security,* 22 Minn. L.Rev. 177.

common-law marriage existed in 1933; however, the trial court found that both parties knew the defendant did not receive a divorce from his first wife until 1942, a date after the outlawing of common-law marriages in Minnesota. On appeal, this court stated (222 Minn. 171, 23 N.W.2d 583):

> "The lower court found that plaintiff knew of defendant's prior marriage at the time the alleged common-law marriage commenced, and an examination of the record discloses ample evidence to support this conclusion. Where the arrangement under which the parties lived together was a meretricious one, the court will grant no relief. *In re Brenchley's Estate,* 96 Wash. 223, 164 P. 913, L.R.A.1917E, 968; *In re Sloan's Estate,* 50 Wash. 86, 96 P. 684, 17 L.R.A. (N.S.) 960. The element of good faith is controlling. *Figoni v. Figoni,* 211 Cal. 354, 295 P. 339; *Schneider v. Schneider,* 183 Cal. 335, 191 P. 533, 11 A.L.R. 1386. Further, in such a situation, there is no implied obligation on the part of the man to compensate the woman for household services rendered by her. *Estate of Fox,* 178 Wis. 369, 190 N.W. 90, 31 A.L.R. 420. *The parties are left to resort to such action in regard to their property rights as they may be advised.*" (Italics supplied.)

The appellant argues *Baker* controls here. As pointed out by the trial court, however, *Baker* merely determined that a meretricious [2] relationship deprived the woman plaintiff of any right as a *wife* in property owned *solely* by the man defendant. Thus, the *Baker* case merely removed the statutory remedies prescribed in a divorce action as between persons who were never married. It did not prescribe what other remedies might be open to the parties for as the court noted in the final sentence of the opinion:

> "The parties are left to resort to such action in regard to their property rights as they may be advised."

Thus, present Minnesota law offers few hard guidelines.

In December of 1976, however, the California Supreme Court handed down a decision applicable to this case: *Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976). The case resolved each of the three problem areas in favor of the enforcement of such agreements and set forth numerous guiding principles for dealing with claims of property rights arising out of non-marital relationships. In the *Marvin* case itself the woman plaintiff averred in her complaint that she and the man defendant [Lee Marvin] "entered into an oral agreement" that while "the parties lived together they would combine their efforts and earnings and would share equally any and all property accumulated as a result of their efforts whether individual or combined" and further that they agreed to "hold themselves out to the general public as husband and wife" and that "plaintiff would further render her services as a companion, homemaker, housekeeper and cook to * * * defendant." In addition, the plaintiff alleged that she agreed to "give up her lucrative career as an entertainer [and] singer" to "devote her full time to defendant * * * as a companion, homemaker, housekeeper and cook," and that the defendant in return agreed to "provide for all of plaintiff's financial support and needs for the rest of her life." The plaintiff lived with the defendant for 5½ years and, she alleged, fulfilled her obligations under the agreement. At the end of that period the defendant compelled her to leave his household and continued to support her for an additional year and a half. Thereafter, he refused to provide further support and she brought suit asking for declaratory relief with respect to her contract and property rights and for a constructive trust to be imposed upon half the property acquired during the course of the relationship. After the trial court granted the defendant's motion for judgment on the pleadings, the plaintiff appealed.

**2.** "Meretricious" spouse describes a relationship where the parties knew they were cohabitating without marriage. On the other hand, a "putative" spouse is one who in good faith believes they are married.

The California Supreme Court reversed and held the complaint stated a cause of action for breach of an express contract. The defendant had argued that the enforcement of the contract would violate public policy because it was so closely related to the "immoral" relationship of the parties; however, after a review of cases the court noted (18 Cal.3d 669, 134 Cal.Rptr. 821, 557 P.2d 112):

" * * * The decisions instead disclose a narrower and more precise standard: a contract between nonmarital partners is unenforceable only *to the extent* that it explicitly rests upon the immoral and illicit consideration of meretricious sexual services."

And in summary, stated (18 Cal.3d 674, 134 Cal.Rptr. 825, 557 P.2d 116):[3]

" * * * [W]e base our opinion on the principle that adults who voluntarily live together and engage in sexual relations are nonetheless as competent as any other persons to contract respecting their earnings and property rights. Of course, they cannot lawfully contract to pay for the performance of sexual services, for such a contract is, in essence, an agreement for prostitution and unlawful for that reason. But they may agree to pool their earnings and to hold all property acquired during the relationship in accord with the law governing community property; conversely they may agree that each partner's earnings and the property acquired from those earnings remains the separate property of the earning partner. So long as the agreement does not rest upon illicit meretricious consideration, the parties may order their economic affairs as they choose, and no policy precludes the courts from enforcing such agreements." (Footnote omitted.)[4]

The court then found that under the newly enunciated standard that the contract constituted an agreement to pool their earnings and thus did not rest upon any unlawful consideration and furnished a basis upon which the trial court could render declaratory relief.

The court also went on to state that the plaintiff's complaint could be amended to state a cause of action founded upon theories of implied contract or equitable relief independent of any express contract, based on the reasonable expectations of the parties. In so doing, it noted with respect to contribution of services, a point at issue here, (18 Cal.3d 679, 134 Cal.Rptr. 828, 557 P.2d 119):

"Still another inconsistency in the prior cases arises from their treatment of property accumulated through joint effort. To the extent that a partner had contributed *funds* or *property,* the cases held that the partner obtains a proportionate share in the acquisition, despite the lack of legal standing of the relationship. [Citation omitted.] Yet courts have refused to recognize just such an interest based upon the contribution of *services.* As Justice Curtis points out 'Unless it can be argued that a woman's services as cook, housekeeper, and homemaker are valueless, it would seem logical that if, when she contributes money to the purchase of property, her interest will be protected, then when she contributes her services in the home, her interest in property accumulated should be protected.' "

The court also stated that concepts of "guilt" did not justify an unequal division

---

**3.** The court further noted in an accompanying footnote: "A great variety of other arrangements are possible. The parties might keep their earnings and property separate, but agree to compensate one party for services which benefit the other. They may choose to pool only part of their earnings and property, to form a partnership or joint venture, or to hold property acquired as joint tenants or tenants in common, or agree to any other such arrangement. (See generally Weitzman, *Legal Regula-* *tion of Marriage: Tradition and Change* (1974) 62 Cal.L.Rev. 1169.)" *Marvin v. Marvin,* 18 Cal.3d 660, 674, note 10, 134 Cal.Rptr. 815, 825, 557 P.2d 106, 116 (1976).

**4.** The court did note, however, that under the proper circumstances such an agreement might be invalid as an agreement to promote or encourage divorce. See, 18 Cal.3d 673, note 8, 134 Cal.Rptr. 824, 557 P.2d 115.

of property between two "guilty" persons[5] and that although the institution of marriage was one to be fostered the continuation of rules which resulted in inequitable distribution of property accumulated during a nonmarital relationship was neither a just nor an effective way of effecting that policy. Further, it noted (18 Cal.3d 682, 134 Cal.Rptr. 830, 557 P.2d 121):

" * * * [A]lthough parties to a nonmarital relationship obviously cannot have based any expectations upon the belief that they were married, other expectations and equitable considerations remain. The parties may well expect that property will be divided in accord with the parties' own tacit understanding and that in the absence of such understanding the courts will fairly apportion property accumulated through mutual effort. We need not treat nonmarital partners as putatively married persons in order to apply principles of implied contract, or extend equitable remedies; we need to treat them only as we do any other unmarried persons." (Footnote omitted.)

Then, in summary with respect to implied contract or equitable relief (18 Cal.3d 684, 134 Cal.Rptr. 831, 557 P.2d 122):

"We conclude that the judicial barriers that may stand in the way of a policy based upon the fulfillment of the reasonable expectations of the parties to a nonmarital relationship should be removed. As we have explained, the courts now hold that express agreements will be enforced unless they rest on an unlawful meretricious consideration. We add that in the absence of an express agreement, the courts may look to a variety of other remedies in order to protect the parties' lawful expectations.

"The courts may inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract or implied agreement of partnership or joint venture (see *Estate of Thornton* (1972) 81 Wash.2d 72, 499 P.2d 864), or some other tacit understanding between the parties. The courts may, when appropriate, employ principles of constructive trust (see *Omer v. Omer* (1974) 11 Wash.App. 386, 523 P.2d 957) or resulting trust (see *Hyman v. Hyman* (Tex.Civ.App.1954) 275 S.W.2d 149). Finally, a nonmarital partner may recover in quantum meruit for the reasonable value of household services rendered less the reasonable value of support received if he can show that he rendered services with the expectation of monetary reward. (See *Hill v. Estate of Westbrook, supra,* 39 Cal.2d 458, 462, 247 P.2d 19.)" (Footnotes omitted.)[6]

The *Marvin* case thus stands for the following three principles, which the court it-

---

**5.** In a footnote the court stated: "Justice Finley of the Washington Supreme Court explains: 'Under such circumstances [the dissolution of a nonmarital relationship], this court and the courts of other jurisdictions have, in effect, sometimes said, "We will wash our hands of such disputes. The parties should and must be left to their own devices, just where they find themselves." To me, such pronouncements seem overly fastidious and a bit fatuous. They are unrealistic and, among other things, ignore the fact that an unannounced (but nevertheless effective and binding) rule of law is inherent in any such terminal statements by a court of law. The unannounced but inherent rule is simply that the party who has title, or in some instances who is in possession, will enjoy the rights of ownership of the property concerned. The rule often operates to the great advantage of the cunning and the shrewd, who wind up with possession of the property, or title to it in their names, at the end of a so-called meretricious relationship. So, although the courts proclaim that they will have nothing to do with such matters, the proclamation in itself establishes, as to the parties involved, an effective and binding rule of law which tends to operate purely by accident or perhaps by reason of the cunning, anticipatory designs of just one of the parties.' (*West v. Knowles* (1957) 50 Wash.2d 311, 311 P.2d 689, 692 (conc. opn.).)" 18 Cal.3d 682, note 21, 134 Cal.Rptr. 830, 557 P.2d 121.

**6.** An excellent review of various remedies other than breach of express contract is found in Bruch, *Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services,* 10 Family Law Quarterly 101, 114. See, also, Folberg & Buren, *Domestic Partnership: A Proposal for Dividing the Property of Unmarried Families,* 12 Williamette L.J. 453.

self enunciated as follows (18 Cal.3d 665, 134 Cal.Rptr. 819, 557 P.2d 110):

"We conclude: (1) The provisions of the [divorce statutes] do not govern the distribution of property acquired during a nonmarital relationship; such a relationship remains subject solely to judicial decision. (2) The courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. (3) In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of *quantum meruit*, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case."

In the present case, the action for division of property following the termination of the relationship was brought as a partition action. The trial court allowed the respondent to partition both with respect to the personal and real property accumulated during the relationship and utilized its inherent equitable powers to allot the respective interests of the parties in the property. In short, the trial court enforced what the evidence indicates were the reasonable expectations of the parties. Under the facts of this case, the partition statute was an appropriate vehicle to do so. Equitable principles are applicable to supplement the partition statutes. Although the statutory procedure must be followed, once the court has taken jurisdiction of the case it may exercise its general equitable powers to effect the most advantageous plan which the nature of the particular case admits. The statute does not restrict equity's normal functions as an aid to complete justice. *Swogger v. Taylor,* 243 Minn. 458, 68 N.W.2d 376 (1955). There is no particular impediment to so doing here. Personal property generally may be the subject of a partition action. 59 Am.Jur.2d, Partition, § 162; 68 C.J.S. Partition § 24. The trial

court found that the parties had lived together for over 21 years, had raised a son to maturity, and had held themselves out to the public as husband and wife. The home and some personal property were in joint tenancy. Thus, the trial court was justified in finding that on all the facts of this particular case the parties intended that their modest accumulations were to be divided on an equal basis on the theory of an irrevocable gift from Mr. Olson to respondent of those assets purchased solely with his earnings and that the contribution of respondent to the remodeling of the home was to be treated in the same manner.

The trial court is affirmed in all respects.