IRMA KOZLOWSKI, PLAINTIFF-RESPONDENT, v.
THADDEUS KOZLOWSKI, DEFENDANT-APPELLANT.

Argued April 2, 1979—Decided June 25, 1979.

*Mr. Ben J. Slavitt* argued the cause for appellant ,(*Messrs. Slavitt, Fish & Cowen,* attorneys; *Ms. Terry Kassel* on the brief).

*Mr. Michael F. Markensohn* argued the cause for respondent.

The opinion of the court was delivered by

HALPERN, P. J. A. D. (temporarily assigned). The primary issue on appeal is whether a man and a woman who are not married to each other, and who live together without a promise of marriage, may. enter into a' contract which, if otherwise valid, is enforceable by our courts. The trial judge,

in a detailed and well-reasoned opinion, 164 *N. J. Super.* decided the issue in favor of plaintiff, and we certified the appeal then pending unheard in the Appellate Division 79 *N. J.* 475 (1978).

The essentially undisputed facts are fully set forth in the trial judge's opinion:

In 1962 plaintiff, a Polish immigrant with little knowledge of the English language and little social contact outside of her own family and ethnic community, met defendant, a personable, sophisticated, apparently well-to-do business man who immediately exhibited an amorous interest in her. She was then 48 years old, married and mother of two children. He was six years younger than she, also married and father of two children. He quickly expressed his love for her and before long insisted that they leave their families and set up a new household together. After about four months of vacillating and agonizing, she capitulated. Together the loving couple moved into an apartment and later a house, in which they lived in what may be fairly characterized as the illicit equivalent of marital bliss. Three of the four children of their prior marriages joined them during the early years of their new relationship and grew up in an atmosphere not dissimilar to that of a normal family unit. The last child reached adulthood and left the household in about 1970, after which defendant sold the original house and purchased a smaller one for himself and plaintiff alone. The parties lived together for a total of 15 years, continuously except for two brief separations.

His wealth appears to have increased during that 15-year cohabitation, but he kept his business affairs to himself. Title to all of his assets, including the residences, remained solely in his own name. She knew little about his business affairs, was unaware of the extent of his assets and income and was completely dependent upon him for all of her needs, maintenance and support. She had no possessions other than clothing, personal effects and his gifts of jewelry and furs. In addition, he provided support and maintenance for all three children in the household, hers and his own.

She, on her part, provided substantial services, including housekeeping, shopping, acting as mother to the children, escorting and accompanying defendant as he desired, and serving as hostess when necessary for his customers and business associates. The latter took her to be his wife although there is no doubt that relatives and close friends on both sides were fully aware of the true relationship of the parties. Interestingly, however, her use of the name Kozlowski provides no evidence that would be of assistance in resolving this controversy. By remarkable coincidence, her first husband had pre-

cisely the same surname though unrelated to defendant. Her continued use of the name Kozlowski was, therefore, entirely proper and provides no clue as to the intentions of the parties.

She asked him about marriage from time to time. During the early years his responses were evasive. In or about 1968 the parties had a serious disagreement and separated for a week or so. Before plaintiff left, defendant had her sign a release in consideration for which she acknowledged receipt of the sum of $5,000 in full satisfaction of all claims she might have against him. That consideration consisted of $2,000 in cash delivered to plaintiff when she signed the release and cancellation of an obligation of plaintiff's daughter to return $3,000 previously advanced by defendant for her educational expenses.

Within a week after that separation defendant sought out plaintiff and pleaded for her to return. He insisted that they would be happy together for the rest of their lives, that he needed her, that he would take care of her and provide for her if she would only come back and resume her functions in the household as she had performed them in the past.

I find as a fact that at this juncture she again asked him about the prospects of marriage. He was no longer evasive — he made it clear that he did not intend to marry her nor did he indicate any desire to free himself from his pre-existing marriage. On the contrary, he responded to her marital suggestions by declaring that a marriage license is only a piece of paper and that "it's what is in the heart that really counts."

She moved back into the house they had previously shared and resumed the same relationship as theretofore, but did so knowing that he refused to take steps toward marriage. She proceeded to again perform services of value to defendant, including housekeeping, cooking, food shopping, serving as his escort and companion and entertaining his business associates and customers as he desired. The parties, it may be assumed, also indulged in a meretricious relationship.[1]

In July 1977 it became obvious that defendant had another romantic interest, no longer loved plaintiff and wanted to be rid of her. She was crushed and hurt and left in a huff. Without her knowledge he had recently instituted a suit for divorce against his wife of so many years, and a divorce judgment was ultimately rendered dissolving that marriage, after the parties hereto separated. He has since married; the bride is at least 30 years younger than plaintiff.

---

[1]We assume that by using the term "meretricious relationship" the trial judge referred to the sexual aspect of their agreement to live together.

I am satisfied, based upon the evidence produced, that Kozlowski originally promised to divorce his wife in order to be free to marry plaintiff. He went even further: he sought out plaintiff's then husband and demanded that he permit or arrange for a divorce for her. In fact, a divorce was obtained for plaintiff within the early years of the relationship between the parties hereto. On the other hand, defendant's then existing marriage was not dissolved until 1977 after he and plaintiff had separated and severed their relationship. No explanation for the delay in attempting to dissolve his prior marriage was offered. [164 *N. J. Super.* at 167–169]

We are satisfied from a review of the record that the trial judge could reasonably have reached his factual and legal determinations on sufficient credible evidence present in the record as a whole, giving due regard to his ability to judge the credibility of the witnesses. *Nat'l Newark & Essex Bank v. American Insurance Co.,* 76 *N. J.* 64, 78 (1978); *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N. J.* 474, 483–484 (1974); *State v. Johnson,* 42 *N. J.* 146, 162 (1964).

Because the issues presented are novel in New Jersey and have potentially far-reaching effects, we deem it advisable to comment briefly on the parameters of Judge Polow's decision.

I

■■ The contract between the parties hereto, entered into in 1962 under a promise of marriage, was not a partnership or a joint venture entitling plaintiff to a share of defendant's accumulated assets. Relief predicated upon a promise of marriage has been barred since 1935 by the Heart Balm Act, *N. J. S. A.* 2A:23–1 *et seq.*

■ Plaintiff is not entitled to alimony or equitable distribution. Alimony may be awarded only in actions for divorce or nullity, and equitable distribution is awarded only in actions for divorce. *N. J. S. A.* 2A:34–23, *et seq.*

II

In 1968, following their separation of one week's duration, it became clear that defendant had no intention of marrying

plaintiff and he advised her of that fact. Despite the sharp factual dispute on the subject, Judge Polow found that at that time defendant expressly agreed to support plaintiff for the rest of her life. Thereafter, their relationship continued until 1977 when defendant caused plaintiff to leave his home shortly before he married another woman.

Whether we designate the agreement reached by the parties in 1968 to be express, as we do here, or implied is of no legal consequence. The only difference is in the nature of the proof of the agreement. Parties entering this type of relationship usually do not record their understanding in specific legalese. Rather, as here, the terms of their agreement are to be found in their respective versions of the agreement, and their acts and conduct in the light of the subject matter and the surrounding circumstances. *Martin v. Campanaro,* 156 *F.* 2d 127, 129 (2 Cir.), *cert.* den. 329 *U. S.* 759, 67 *S. Ct.* 112, 91, *L. Ed.* 2d 654 (1946) ; *St. Paul Fire, etc., Co. v. Indemnity Ins. Co. of No. America,* 32 *N. J.* 17, 23 (1960) ; *West Caldwell v. Caldwell,* 26 *N. J.* 9, 28–29 (1958) ; 1 *Williston, Contracts* (3 ed. 1957), § 3 at 8–12 ; 1 *Corbin, Contracts* (1963), § 18 at 39–43.

The trial judge, in finding that an express agreement was made by defendant to support plaintiff for life, believed the testimony of plaintiff and the testimony of plaintiff's daughter, son-in-law and niece. After weighing all the testimony concerning what occurred following the reconciliation in 1968, he stated in his oral conclusions :

However, the defendant did not let it lie there. Once again there has been no contradition. It was the testimony of the plaintiff that very shortly after she left [1968], he came to her. He again pleaded his love for her. He again urged her to live wih him and run his household and insisted that they would live happily for ever after, again urged her to let him take care of her, that he would provide for her for the rest of her life.

Once again this is an area of some conflict in the testimony. I reject his testimony. I observed his demeanor on the witness stand. I listened to his answers. I not only reject counsel's characterization of this man as sensitive, I do not believe him. I'm perfectly

satisfied that he did promise to take care of her the rest of her life as she testified. I find also that when she indicated concern about what would happen to her if he died first, he reassured her by telling her he would see that she was taken care of, and again I find that as a fact.

His findings are amply supported in the record.

Such agreements by adult nonmarital partners which are not explicitly and inseparably founded on sexual services are enforceable. *Marvin v. Marvin,* 18 *Cal.* 3d 660, 134 *Cal. Rptr.* 815, 557 *P.* 2d 106 (1976); Comment, 90 *Harv. L. Rev.* 1708, 1709 (1977); see also *Mannion v. Greenbrook Hotel, Inc.,* 138 *N. J. Eq.* 518, 521 (E. & A. 1946). The agreement here involved, as made in 1968 and thereafter performed, is therefore enforceable. We are in accord with the following views expressed on this subject in *Marvin, supra*:

> Although the past decisions hover over the issue in the somewhat wispy form of the figures of a Chagall painting, we can abstract from those decisions a clear and simple rule. The fact that a man and woman live together without marriage, and engage in a sexual relationship, does not in itself invalidate agreements between them relating to their earnings, property, or expenses. Neither is such an agreement invalid merely because the parties may have contemplated the creation or continuation of a nonmarital relationship when they entered into it. Agreements between nonmarital partners fail only to the extent that they rest upon a consideration of meretricious sexual services. Thus the rule asserted by defendant, that a contract fails if it is "involved in" or made "in contemplation" of a nonmarital relationship, cannot be reconciled with the decisions. [18 *Cal.* 3d at 669, 134 *Cal. Rptr.* at 822, 557 *P.* 2d at 113]
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> In summary, we believe that the prevalence of nonmarital relationships in modern society and the social acceptance of them, marks this as a time when our courts should by no means apply the doctrine of the unlawfulness of the so-called meretricious relationship to the instant case. As we have explained, the nonenforceability of agreements expressly providing for meretricious conduct rested upon the fact that such conduct, as the word suggests, pertained to and encompassed prostitution. To equate the nonmarital relationship of today to such a subject matter is to do violence to an accepted and wholly different practice.
>
> We are aware that many young couples live together without the solemnization of marriage, in order to make sure that they can suc-

cessfully later undertake marriage. This trial period, preliminary to marriage, serves as some assurance that the marriage will not subsequently end in dissolution to the harm of both parties. We are aware, as we have stated, of the pervasiveness of nonmarital relationships in other situations.

The mores of the society have indeed changed so radically in regard to cohabitation that we cannot impose a standard based on alleged moral considerations that have apparently been so widely abandoned by so many. Lest we be misunderstood, however, we take this occasion to point out that the structure of society itself largely depends upon the institution of marriage, and nothing we have said in this opinion should be taken to derogate from that institution. The joining of the man and woman in marriage is at once the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime.

We conclude that the judicial barriers that may stand in the way of a policy based upon the fulfillment of the reasonable expectations of the parties to a nonmarital relationship should be removed. As we have explained, the courts now hold that express agreements will be enforced unless they rest on an unlawful meretricious consideration. [18 *Cal.* 3d at 683, 134 *Cal. Rptr.* at 831, 557 *P.* 2d at 122]

The philosophy expressed in *Marvin* which refuses to condemn cohabitation by a man and woman who are unmarried as being "meretricious" and, therefore, so tainted as to deny them any relief by the courts, is not generally contrary to our own public policy. In *State v. Saunders,* 75 *N. J.* 200 (1977), we held the fornication statute (*N. J. S. A.* 2A:110–1), as applied to adults, to be unconstitutional because it improperly invaded the parties' right to privacy — thus indicating such conduct is not criminal. An unconstitutional statute is wholly void, and is as inoperative as if it had never been passed. 16 *Am. Jur.* 2d, *Constitutional Law,* § 177; *State v. Guida,* 119 *N. J. L.* 464, 465 (E. & A. 1937); *In re Rose,* 122 *N. J. L.* 507, 508–509 (Sup. Ct. 1939). Effective September 1, 1979 fornication is no longer designated as a crime under *N. J. S. A.* 2C:1–1, *et seq.*[2]

---

[2]In fact, the new Penal Code does not proscribe sexual conduct performed in private by consenting adults. See *N. J. S. A.* 2C:14–1 to 7; *State v. Ciuffini,* 164 *N. J. Super.* 145 (App. Div. 1978).

Therefore, the cohabitation by the parties after 1968 cannot be termed "meretricious" because they engaged in sexual relations. Moreover the relationship between the parties hereto, as entered into in 1968 at a time when plaintiff was divorced, was not tainted by the fact that defendant was married at that time. A male, married or unmarried, can be guilty of adultery only if he has sexual relations with a married woman. See *State v. Lash,* 16 *N. J. L.* 380 (Sup. Ct. 1838); 1 *Crim. Laws of New Jersey 3d,* § 15.1 (1970); Perkins, *Criminal Law,* at 377 (2 ed. 1969). Therefore, in the instant case, leaving aside one's moral or religious beliefs, there was no legal impediment to the parties cohabiting in 1968. Thus any lawful agreement made by them is enforceable.

## III

To dispel any misunderstanding, we emphasize that our decision today has not judicially revived a form of common law marriage which has been proscribed in New Jersey since 1939 by *N. J. S. A.* 37:1–10. We do no more than recognize that society's mores have changed, and that an agreement between adult parties living together is enforceable to the extent it is not based on a relationship proscribed by law, or on a promise to marry. What was said in *Hewitt v. Hewitt,* 62 *Ill. App.* 3d 861, 20 *Ill. Dec.* 476, 380 *N. E.* 2d 454 (App. Ct. 1978), a case quite similar to the case at bar, expresses a philosophy with which we agree:

We conclude that the reasoning followed in *Marvin* is particularly persuasive upon the allegations here pleaded wherein plaintiff has alleged facts which demonstrate a stable family relationship extend-over a long period of time.

It would be superficial to conclude that by this determination this court has revived or restored a form of common law marriage now forbidden by statute. It is apparent that the matters to be alleged and the facts to be proved here are substantially, if not enormously, different.

The value of a stable marriage remains unchallenged and is not denigrated by this opinion. It is not realistic to conclude that this determination will "discourage" marriage for the rule for which de-

fendant contends can only encourage a partner with obvious in-
come-producing ability to avoid marriage and to retain all earnings
which he may acquire. One cannot earnestly advocate such a policy.
[20 *Ill. Dec.* at 482, 380 *N. E.* 2d at 460]

### IV

█ We find no error in Judge Polow's refusing to permit
defendant to testify concerning plaintiff's alleged "alcoholism
and habitual drunkenness." Her end of the agreement was,
in general terms, to take care of defendant, his children and
his home; to cook and keep house for him, and to help en-
tertain his friends and business associates. There was no in-
dication that the understanding of the parties required plain-
tiff to abstain from drinking alcoholic beverages. At best, the
judge's ruling was discretionary, and we find no abuse of that
discretion. See *Wimberly v. Paterson,* 75 *N. J. Super.* 584,
608–609 .(App. Div. 1962), certif. den. 38 *N. J.* 340 (1962);
*Evid. R.* 4.

### V

█ While the damages flowing from defendant's
breach of contract are not ascertainable with exactitude, such
is not a bar to relief. Where a wrong has been committed,
and it is certain that damages have resulted, mere uncertainty
as to the amount will not preclude recovery — courts will
fashion a remedy even though the proof on damages is in-
exact. *Albemarle Paper Co. v. Moody,* 422 *U. S.* 405, 418–
419, 95 *S. Ct.* 2362, 45 *L. Ed.* 2d 280 (1975); *Tessmar v.
Grosner,* 23 *N. J.* 193, 203 (1957). Accordingly, plaintiff is
entitled to a one-time lump sum judgment in an amount
predicated upon the present value of the reasonable future
support defendant promised to provide, to be computed
by reference to her life expectancy as shown by the tables
referred to in *R.* 1:13–5.

This was the approach adopted by Judge Polow in en-
tering judgment for plaintiff on July 31, 1978 for $55,000.
The judgment, however, further provided that "said sum

shall be paid as this Court, on motion, shall determine".
While the record is unclear, it would appear that on August
4, 1978 Judge Polow granted plaintiff's motion and ordered
a limited new trial on damages and reserved decision on de-
fendant's cross-motion for a method of payout of the $55,000
judgment. Thereafter, by letter to counsel of September 18,
1978, Judge Polow advised them that he would proceed no
further with the motions in view of the pending appeal.

Accordingly, we affirm the judgment below as entered; and
remand the matter for such further proceedings as Judge
Polow, in his sound discretion, determines should be held on
the issues of damages and payout.

PASHMAN, J. concurring.

I join fully in Judge Halpern's majority opinion. In recent
years, cohabitation between unmarried adults has become an
increasingly prevalent phenomenon. To label such conduct
as "meretricious" — that is, as akin to prostitution — would
ignore the realities of today's society. It is likely true that
all such understandings between nonmarital partners involve
in some way a mutual sexual relationship or at least contem-
plate its existence. This, however, does not make their
conduct the equivalent of prostitution — whatever might be
one's view as to its "morality." Many persons have accepted
this type of living arrangement as an alternative to, or a
preliminary step en route to, formal marriage. In other
instances, such relationships provide the parties with com-
panionship and a means of defraying household expenses,
as well as allow each to benefit from any particular skills
that the other might possess.

The decision to cohabit without marriage represents each
partner's voluntary choice as to how his or her life should
be ordered — a choice with which the State cannot interfere,
see State v. Saunders, 75 N. J. 200 (1977). As in the case
of any other individuals, these partners remain free to
enter into valid and enforceable agreements concerning their
earnings and property rights. See, e.g., Marvin v. Marvin,

18 *Cal.* 3d 660, 134 *Cal. Rptr.* 815, 557 *P.* 2d 106 (Sup. Ct. 1976) ; *Hewitt v. Hewitt, 62 Ill. App.* 3d 861, 20 *Ill. Dec.* 476, 380 *N. E.* 2d 454 (Ct. App. 1978) ; *Carlson v. Olson,* 256 *N. W.* 2d 249 (Minn. Sup. Ct. 1977) ; *Beal v. Beal, 282 Or.* 115, 577 *P.* 2d 507 (Sup. Ct. 1978).

As the majority emphasizes, these agreements may be express or implied. See *ante* at 384. At bottom, courts must determine the intent or understanding of the parties as to whether, and to what extent, their assets and income are to be divided. This intent may be discerned from their explicit language, as in the present case, or from their conduct and actions interpreted in light of all the surrounding circumstances. Regardless of the precise manner in which the parties manifest agreement, however, it is their reasonable expectations that must be honored. And the Court may look to a variety of remedies to protect that expectation. *See, e. g., Marvin, supra,* 18 *Cal.* 3d at 683, 134 *Cal. Rptr.* at 831, 557 *P.* 2d at 122–123; *Hewitt, supra,* 20 *Ill. Dec.* at 481–482, 380 *N. E.* 2d at 459–460; *Carlson, supra,* 256 *N. W.* 2d at 253–255; *Beal, supra,* 282 *Or.* at 121-122, 577 *P.* 2d at 510.

The question which remains is whether quasi-contractual and equitable remedies should also be available to the parties upon dissolution of their relationship. Most unwed persons who choose to cohabit likely do so "in ignorance of the [financial] consequences of either marriage or non-marriage" and "with absolutely no thought given to the legal consequences of their relationship." Bruch, "Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services," 10 *Family L. Q.* 101, 135 (1976). Consequently, an agreement such as is here present may not exist in the vast majority of cases.

Given this circumstance, it would be unwise to require some form of contract as a prerequisite to relief in the courts. Rather, we should presume "that the parties intend[ed] to deal fairly with each other" upon dissolution of the relationship, *Marvin, supra,* 18 *Cal.* 3d at 683, 134 *Cal. Rptr.* at 830, 557 *P.* 2d at 121, and consequently, in the

absence of agreement, "employ the doctrine of *quantum meruit,* or equitable remedies such as constructive or resulting trusts" in order to insure that one party has not been unjustly enriched, and the other unjustly impoverished, on account of their dealings, *id.,* 18 *Cal.* 3d at 665, 134 *Cal. Rptr.* at 819, 557 *P.* 2d at 110. *See, e. g., Hewitt, supra,* 20 *Ill. Dec.* at 481–482, 380 *N. E.* 2d at 459–460.

Since such remedies are grounded in equity, their applicability would depend upon the facts and circumstances of each particular case. The factors to be weighed by a trial judge would include, as examples only, the duration of the relationship, the amount and types of services rendered by each of the parties, the opportunities foregone by either in entering the living arrangement, and the ability of each to earn a living after the relationship has been dissolved. These remedies may be cumulative or exclusive. Decisions concerning the complexities that might arise upon application of these principles must be determined on a case by case basis.

In the present case, no resort need be had to such remedies inasmuch as an explicit agreement did exist. I therefore concur fully in the majority's opinion.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER and Judge HALPERN—7.

*For reversal*—None.