# United States Court of Appeals
## For the First Circuit

No. 03-2281

GAIL M. NORTON,

Plaintiff, Appellant,

v.

DAVID J. MCOSKER,
Executor of the Estate of Russell J. Hoyt,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Saris,[*] District Judge.

J. Ronald Fishbein, with whom Edward John Mulligan, were on brief, for appellant.
Gerald C. DeMaria, with whom Higgins, Cavanagh & Cooney, LLP, was on brief, for appellee.

May 19, 2005

[*] Of the District of Massachusetts, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  Plaintiff-appellant, Gail M. Norton, engaged in an adulterous relationship with decedent, Russell L. Hoyt, for twenty-three years.[1]  During the course of the relationship, Hoyt allegedly maintained that he would divorce his wife, marry Norton, and support Norton for the rest of her life.  Following the end of the relationship, when it became apparent to Norton that Hoyt would not continue to support her and that the relationship could not be reconciled, Norton sued Hoyt, claiming (1) promissory estoppel; (2) intentional infliction of emotional distress; (3) the tort of outrage; (4) fraud; and (5) breach of promise to marry.  The third, fourth and fifth claims were dismissed and the district court granted Hoyt's motion for summary judgment on the remaining claims.

Norton now seeks our review of the district court's assertion of jurisdiction over the case and the grant of summary judgment on the promissory estoppel and intentional infliction of emotional distress claims.  We affirm the judgment below, essentially for the reasons articulated in the district court's opinion.

---

[1]  Hoyt was the defendant in the district court case.  He passed away before the appeal was argued, and as a result, David J. McOsker, the executor of Hoyt's estate, replaces him as defendant on appeal.

-2-

## I.

Norton, a Rhode Island resident, met Hoyt, a Connecticut resident, in July 1974. When they met, Hoyt led Norton to believe that he was divorced. However, shortly after their adulterous relationship began, Norton discovered that Hoyt was actually married. At that time, Hoyt told Norton he was getting a divorce. Later, on or about January 5, 1975, Hoyt told Norton that he had moved out of the marital residence in order to effectuate the divorce process. Because of these statements, and similar alleged representations over the years, Norton remained in a relationship with Hoyt for twenty-three years. Hoyt remained married throughout their twenty-three year relationship.

At the outset of the relationship, Norton was employed as an elementary school teacher in the Bristol, Rhode Island public school system, a position she had held for some years. Norton resigned her teaching position in 1980, allegedly in response to Hoyt's urging that she leave her position so that she could be free to spend more time with him and travel around the world with him, and in reliance upon Hoyt's promises to provide for her and eventually marry her.[2]

Norton enjoyed an extravagant lifestyle as a result of her relationship with Hoyt. She traveled around the world with

---

[2] Norton offered a different reason in her resignation letter, where she stated that she was resigning in order to better pursue creative endeavors.

him, and he provided her with sundry material benefits and comforts. He paid the rent on homes they shared in Vermont and Rhode Island, purchased and maintained her automobiles, allowed her the use of his luxury yachts and presented her with lavish gifts. Hoyt ensured Norton's financial security throughout the relationship, and she became accustomed to this manner of living over the years.

Norton states that she trusted Hoyt and believed that he would get a divorce. Occasionally, she and Hoyt discussed plans for their wedding. She asserts that she would not have remained in the relationship with Hoyt if it were not for his frequent promises to divorce his wife, marry Norton, and support her for the rest of her life.

Norton also avers that, in reliance upon his inducements and promises, she became pregnant by Hoyt. However, no child was born of the relationship because Norton suffered a spontaneous miscarriage.

In March 1998, Hoyt formally ended the relationship with Norton. Norton was distraught by this turn of events and sought counseling and medical attention to deal with the depression and anxiety she was experiencing. She allegedly suffered from headaches and stomachaches, as well as vomiting and weight loss. Norton reported that she was not able to resume work and that she

possibly would not ever be able to commit to another relationship. She also reported having thoughts of suicide.

A registered nurse and licensed social worker who treated Norton recorded that the "presenting problem [was] her twenty-three year relationship in turmoil." The nurse also noted that Norton was "very shocked, . . . and [experiencing] loss of concentration."

A psychiatrist, Dr. Henry Altman, also worked with Norton, and Hoyt joined Norton in several sessions with Dr. Altman. In one session, Hoyt allegedly told Norton and the doctor that he would continue to support Norton financially and suggested that she would probably be able to live on about $70,000 to $80,000 per year.

Hoyt supported Norton financially for two years following the break-up, providing her with more than $80,000 in total. Norton asserts that when Hoyt broke off the relationship he promised he would place $100,000 in her bank account and establish a trust to support her for life. Norton also alleges that Hoyt told her he had given a letter to his attorney, David McOsker -- who is now the executor of Hoyt's estate -- that would ensure Norton would be provided for in the event anything happened to Hoyt. However, when she contacted McOsker to request a copy of the letter, Norton discovered that no such letter existed.

On March 3, 2001, Norton sued Hoyt in Rhode Island Superior Court, claiming (1) promissory estoppel; (2) intentional

infliction of emotional distress; (3) the tort of outrage; (4) fraud; and (5) breach of promise to marry. Defendant, Hoyt, invoked the federal courts' diversity jurisdiction to remove the case to the United States District Court for the District of Rhode Island. See 28 U.S.C. §§ 1332(a), 1441.

## II.

Before proceeding to the merits of this case, we will address Norton's argument that the district court should have abstained from hearing this case and remanded it to the state court pursuant to the domestic relations exception to federal diversity jurisdiction that has been recognized by the Supreme Court. See Ankenbrandt v. Richards, 504 U.S. 689, 703 (1992). We find that the district court did not err in exercising jurisdiction over these claims.

The domestic relations exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees." Ankenbrandt, 504 U.S. at 703. As we have stated in the past:

> [t]he aim of the exception is to keep federal courts from meddling in a realm that is peculiarly delicate, that is governed by state law and institutions (e.g., family courts), and in which inter-court conflicts in policy or decrees should be kept to an absolute minimum.
>
> Despite the breadth of the phrase "domestic relations exception" and the potential reach of the exception's aim, Ankenbrandt made clear that the exception is narrowly limited. In

> general, lawsuits affecting domestic
> relations, however substantially, are not
> within the exception unless the claim at issue
> is one to obtain, alter or end a divorce,
> alimony or child custody decree.

Dunn v. Cometa, 238 F.3d 38, 41 (1st Cir. 2001).

Notwithstanding the fact that this case has grown out of the dissolution of an intimate relationship, Norton's claims do not sound in family law, let alone the specific areas of divorce, alimony, and child custody. Instead, Norton brought tort and contract claims.

Plaintiff cites the fact that the Rhode Island Superior Court has concurrent jurisdiction over any issue the Family Court may hear, e.g. Rubano v. DiCenzo, 759 A.2d 959, 972 (R.I. 2000), and incorrectly correlates this with the notion that she could therefore have brought the suit originally in Family Court. However, the fact that the Superior Court's jurisdiction includes any claim which might be brought before the Family Court does not mean that the Family Court has jurisdiction coextensive with the Superior Court. As the district court noted, "[t]he Rhode Island Family Court would have no jurisdiction in this case." Norton v. Hoyt, 278 F. Supp. 2d 214, 228 (D.R.I. 2003) (citing R.I. Gen. Laws § 8-10-3 (1956)). Even if the Rhode Island Family Court did have jurisdiction, the domestic relations exception, as interpreted in Dunn, would not apply, because Norton did not bring any claim related to a divorce, alimony, or a child custody decree.

-7-

Thus, Norton's claims are not encompassed by the domestic relations exception to federal jurisdiction and the district court properly asserted jurisdiction over the case.

**III.**

We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the appellant. Fenton v. John Hancock Mut. Life Ins. Co., 400 F.3d 83, 87 (1st Cir. 2005). We will uphold the grant of summary judgment if there is no genuine issue of material fact and appellees are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "An issue is 'genuine' for purposes of summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st Cir. 2004) (quoting Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)).

Because our jurisdiction over this case is diversity-based, Rhode Island state law governs. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Univ. Emergency Med. Found. v. Rapier Invs., Ltd., 197 F.3d 18, 19 n.1 (1st Cir. 1999). As a federal court sitting in diversity, our task is to "interpret and apply as best we can the state rules of decision." Catex Vitol Gas, Inc. v. Wolfe, 178 F.3d 572, 576 (1st Cir. 1999). "Relying on pronouncements of the state supreme court and, if these are not

conclusive, on other instructive sources, ultimately 'our task is to ascertain the rule the state court would most likely follow under the circumstances, even if our independent judgment on the question might differ.'" Id. at 576-77 (quoting Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996)).

## A.  Promissory Estoppel

Norton has attempted to make out a claim of promissory estoppel based on promises that Hoyt allegedly made to her during and immediately following the end of their extramarital relationship.  She claims that Hoyt led her to believe that he would divorce his wife and marry her.  She also claims that Hoyt promised to take care of her for the rest of her life.  Norton avers that she relied on those promises, to her detriment, when she remained in the relationship with Hoyt and left her position as a teacher to be with Hoyt.  She also claims that she gave up the opportunity to marry and have children at a younger age by remaining with Hoyt.

Historically, any promise by Hoyt to divorce his wife and marry Norton, however, would be void as against public policy. See 15 Arthur Linton Corbin, Corbin on Contracts, § 1475 at 545 (1962) ("[I]t is contrary to public policy and illegal for one who has a living spouse to make an engagement to marry another, [regardless of the fact] that the parties to the first marriage are separated and that the new agreement is expressly made conditional on

-9-

procuring a divorce . . . ."). "'[T]he doctrine of estoppel . . . has no application to a contract . . . which is void because it violates . . . the dictates of public policy.'" Doherty v. Bartlett, 81 F.2d 920, 925 (1st Cir. 1936) (quoting approvingly Colby v. Title Ins. & Trust Co., 117 P. 903, 918 (Cal. 1911)). Our analysis of Norton's promissory estoppel claim therefore focuses on the alleged promise of lifetime support.

Rhode Island law recognizes a claim for promissory estoppel. See East Providence Credit Union v. Geremia, 239 A.2d 725 (R.I. 1968). This doctrine is defined in the Restatement (Second) of Contracts, as "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90 at 242 (1981). "Traditionally, the doctrine of promissory estoppel has been invoked as a substitute for a consideration, rendering a gratuitous promise enforceable as a contract." East Providence Credit Union, 239 A.2d at 727. Rhode Island law also embraces extends the doctrine beyond the traditional cases to apply it to "situations in which the promisee's reliance on the promise was induced, and injustice may only be avoided by enforcement of the promise." Alix v. Alix, 497 A.2d 18, 21 (R.I. 1985) (citing East Providence Credit Union, 239 A.2d at 727-28; Calamari &

-10-

Perillo, <u>The Law of Contracts</u> § 6-8 at 211 (2d ed. 1977); 1 Williston, <u>Contracts</u> § 140 at 611-14.).

Norton's promissory estoppel claim fails for two principal reasons: (1) her claim does not satisfy the conditions required to make out a claim of promissory estoppel, and (2) her claim sounds in palimony, which is a cause of action that has not been recognized in Rhode Island.

## 1. The elements of promissory estoppel

Norton's promissory estoppel claim fails as a matter of law because she has failed to satisfy at least two of the three conditions that must be met to establish promissory estoppel.[3] Under Rhode Island law, these conditions are: "1) A clear and unambiguous promise; 2) Reasonable and justifiable reliance upon the promise; and 3) Detriment to the promisee, caused by his or her reliance on the promise." <u>Filippi</u> v. <u>Filippi</u>, 818 A.2d 608, 626 (R.I. 2003).

To meet the first element of promissory estoppel, Norton must establish that Hoyt made a clear, unambiguous and unconditional promise, the terms of which are certain. <u>See</u> <u>B.M.L. Corp.</u> v. <u>Greater Providence Deposit Corp.</u>, 495 A.2d 675, 677 (R.I.

---

[3] We are also skeptical of whether Norton's actions of leaving her position as a schoolteacher and becoming pregnant by Hoyt were done in reliance upon Hoyt's promises <u>of support</u> such that they would satisfy the final element of promissory estoppel -- detrimental reliance upon the promise. However, because we find that Norton has failed to satisfy the first two element of promissory estoppel, it is unnecessary for us to consider the final element.

-11-

1985).  Norton claims that Hoyt promised to divorce his wife, marry Norton and take care of her for the rest of her life.  She has also argued that Hoyt promised to provide lifetime support whether he divorced his wife or not.  See Norton, 278 F. Supp. 2d at 224.

In either case, under Rhode Island law, the alleged promise is probably too vague to be legally enforceable.[4]  At least one court has held that a promise to "take care of" an individual is insufficiently specific to support a claim of promissory estoppel.  See Morone v. Morone, 413 N.E. 2d 1154, 1157 n.3 (N.Y. 1980) (citing Dombrowski v. Somers, 362 N.E. 2d 257, 258 (N.Y. 1977)).  The Rhode Island Supreme Court has shown itself, in a slightly different context, to be particularly sensitive to the vagueness of alleged promises underlying such claims.[5]  See, e.g., Filippi, 818 A.2d at 626.  Hoyt's promise would thus be unlikely to qualify as sufficiently clear and unambiguous under Rhode Island law.

---

[4]  While the promises of support that Norton alleges Hoyt made upon the breakup of their relationship, some of which were made in the presence of others, were more specific, there is no evidence that she relied on those promises to her detriment.

[5]  In Filippi, decedent's daughter brought a breach of contract action against the decedent's estate alleging that decedent promised that the family restaurant "will be yours and you will take care of the family," if she returned to manage the business.  Id. at 612.  The Rhode Island Supreme Court held that the promise was unenforceable because it was unclear and ambiguous.  The court reasoned that decedent "failed to indicate whether he meant [the restaurant] as the business including the good will or simply the stock of [the holding company], which owned the physical assets of the [restaurant]."  Id. at 626.

-12-

We also find Norton's alleged reliance on the promise to be unreasonable. Norton discovered very early in her relationship with Hoyt that he had not been honest with her about his marital status. Then, for twenty-three long years he continually failed to make good on his promise to divorce his wife and marry her. Throughout that time, he repeatedly broke his promises. The record shows that Hoyt continued to engage in family events and, at least at times, to live in his marital home with his wife and children. Therefore, to the extent that Norton did rely on Hoyt's promises to marry her and take care of her for life, this reliance was unreasonable. Norton's promissory estoppel claim thus fails the second element as well. See Filippi, 818 A.2d at 626.

### 2. Palimony Contract

Rhode Island has never recognized a cause of action for palimony. The term "palimony" originated out of the media coverage of the California case Marvin v. Marvin, 557 P.2d 106, 112 (Cal. 1976), in which the Supreme Court of California awarded future support to a nonmarital partner in the absence of an express contract. Palimony is "[a] court's award of post-relationship support or compensation for services, money, and goods contributed during a long-term nonmarital relationship, esp[ecially] where a common-law marriage cannot be established." Black's Law Dictionary 1142 (8th ed. 2004). Although Rhode Island recognizes common-law marriage, it has not recognized palimony claims.

Prior to cases like <u>Marvin</u> v. <u>Marvin</u>, all contracts between parties to an illicit cohabitation arrangement were considered to be made in consideration of their sexual relationship, and therefore courts found the contracts void as against public policy and refused to enforce them. However, as society has grown more accepting of nonmarital cohabitation relationships, courts in some states have grown more willing to enforce contracts made between parties to such relationships. In <u>Marvin</u>, the Supreme Court of California wrote that "[t]he mores of the society have indeed changed so radically in regard to cohabitation that we cannot impose a standard based on alleged moral considerations that have apparently been so widely abandoned by so many." 557 P.2d at 122. However, not every state has jumped on the palimony bandwagon, and Rhode Island has not.

Norton argues that "times are changing" and attempts to show that Rhode Island law is moving "in lock-step" with the changes that the nearby states of Connecticut, Massachusetts and New Jersey recently made when they began enforcing contracts and agreements between unmarried cohabitants.[6] Norton incorrectly

_____

[6] For example, in New Jersey -- which unlike Rhode Island, does enforce palimony claims -- the state Supreme Court "recognized that unmarried adult partners, even those who may be married to others, have the right to choose to cohabit together in a marital-like relationship, and that if one of those partners is induced to do so by a promise of support given her by the other, that promise will be enforced by the court." <u>In re Estate of Roccamonte</u>, 808 A.2d 838, 842 (N.J. 2002) (citing <u>Kozlowski</u> v. <u>Kozlowski</u>, 403 A.2d 902 (N.J. 1979)). The New Jersey court held that a palimony contract

-14-

cites <u>Doe</u> v. <u>Burkland</u>, 808 A.2d 1090 (R.I. 2002), for the proposition that the Rhode Island Supreme Court has recognized a cause of action for palimony. The Rhode Island court did no such thing. In <u>Burkland</u>, the Rhode Island court simply held that "[t]he mere existence of a sexual relationship between two parties does not impair their right to contract with each other for consideration independent of the relationship." <u>Id.</u> at 1094 (citing <u>Marvin</u>, 557 P.2d at 112). In <u>Burkland</u>, following the end of a relationship in which two men had lived together as domestic partners for nine years, one of the former partners sued the other for harassment. The defendant then counterclaimed that the plaintiff had breached an oral agreement to share any property that either party had acquired individually during their relationship. "[T]he counterclaimant alleged that he agreed to 'devote his skills, effort, labors and earnings' to assist plaintiff in his career, and that he provided homemaking services, business consulting, and counseling to plaintiff in consideration for the alleged property-sharing agreement." <u>Burkland</u>, 808 A.2d at 1093. The Rhode Island Supreme Court held that if the plaintiff had actually acquired property with the help of the legitimate services

---

may be express or implied and "concluded that a general promise of support for life, broadly expressed, made by one party to the other with some form of consideration given by the other will suffice to form a contract." <u>Id.</u> at 843.

of the defendant under their alleged property-sharing arrangement, then the defendant might be entitled to relief.  Id. at 1095.

We agree with the district court that Burkland is clearly inapposite in this case.  Norton did not have a property sharing agreement with Hoyt.  Norton seeks enforcement of a promise for future support payments, which is palimony and not a valid cause of action in Rhode Island.

Unfortunately for Norton, who waited twenty-three years for an adulterer to finally leave his wife for good so that they could get married and live happily ever after, her happy ending never came to pass.  Hoyt instead decided to end the relationship with Norton, having never left his wife.  While society does not favor the actions taken by Hoyt in his relationships, Rhode Island law does not provide Norton with a cause of action for palimony arising out of her nonmarital relationship with Hoyt, nor is she able to succeed in a promissory estoppel claim because she has failed to meet the first two, if not all three of the elements of said claim.

## B.  Intentional Infliction of Emotional Distress

We find that Norton has failed to prove intentional infliction of emotional harm.  At the threshold of the analysis of a claim of intentional infliction of emotional distress, we must determine whether "the . . . relationship comprises the kind of soil in which the seeds of a [Restatement (Second) of Torts] § 46

claim for emotional harm may sprout." <u>Russell</u> v. <u>Salve Regina College</u>, 649 F. Supp. 391, 400 (D.R.I. 1986), <u>aff'd</u>, 890 F.2d 484 (1st Cir. 1989), <u>rev'd on other grounds</u>, 499 U.S. 225 (1991). Generally, courts consider whether the relationship created sufficient vulnerability to create a duty on the part of the defendant to avoid inflicting emotional distress. <u>Id.</u> at 401. The Rhode Island Supreme Court has considered this question and determined that this cause of action can arise out of relationships such as debtor/creditor, <u>Champlin</u>, 478 A.2d at 989, and employee/supervisor, <u>Elias</u> v. <u>Youngken</u>, 493 A.2d 158 (R.I. 1985).

The court has not, however, made a definitive judgment as to whether romantic relationships, such as the one in the case at bar, qualify as a basis for an intentional infliction of emotional distress cause of action. The Rhode Island Supreme Court did consider a husband's claim of intentional infliction of emotional distress made against his former wife in <u>Wright</u> v. <u>Zielinski</u>. 824 A.2d 494 (R.I. 2003). However, the court's opinion in <u>Zielinski</u> did not specifically address the question of whether the relationship was such that a duty to avoid emotional harm existed. In <u>Zielinksi</u>, the court held that the husband's claim failed because he failed to adduce expert medical evidence establishing a causal connection between his wife's alleged misconduct and his psychological and physical complaints. <u>Id.</u> at 499.

Since the Rhode Island Supreme Court has shown no signs of limiting this cause of action to a select few relationships, and observing that long-term, romantic relationships frequently involve strong emotions and allow the parties to come to know each other well enough to know the other's vulnerabilities and how to exploit them, we will assume the availability of the claim in this case.

Rhode Island has adopted the standard for an intentional infliction of emotional distress claim set forth in section 46 of the Restatement (Second) of Torts. Swerdlick v. Koch, 721 A.2d 849, 862-63 (R.I. 1998) (citing Champlin v. Washington Trust Co. of Westerly, 478 A.2d 985, 988-89 (R.I. 1984)). Under this standard, liability is only imposed after four factors have been proven:

> (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.

Id. (quoting Champlin, 478 A.2d at 989); see also Marques v. Fitzgerald, 99 F.3d 1, 7 (1st Cir. 1996) (reciting Rhode Island's factors). In addition, unlike many states that have adopted the Restatement, Rhode Island also requires that there be some medical proof establishing physical symptoms of distress. Clift v. Narragansett Television L.P., 688 A.2d 805, 813 (R.I. 1996) (citing Reilly v. United States, 547 A.2d 894, 899 n.3 (R.I. 1988) ("[T]he law in Rhode Island still requires physical symptomatology as an

-18-

element of a claim when a defendant's intentional conduct has allegedly inflicted emotional distress.  In so doing, we have applied a stricter standard of proof for this cause of action than that applied by the Restatement and many other states.")).

The Rhode Island Supreme Court uses a combined standard for the analysis of whether the claim meets the first two elements of an intentional infliction of emotional distress cause of action. See, e.g., Swerdlick, 721 A.2d at 863.  This standard is put forth in the oft-cited comment (d) to section 46 of the Restatement as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d at 73 (1965).

In her affidavit in opposition to defendant's motion for summary judgment, Norton states that "[t]he actions of the defendant in breaking his promises and his abandonment of your affiant have caused affiant to become nervous, anxious, crying,

-19-

depressed and extremely vulnerable." Norton Aff. ¶ 9. However, merely breaking-up an extramarital affair does not constitute outrageous conduct. Although Norton was understandably devastated and depressed by Hoyt's termination of their affair, Hoyt was entitled to break up with his girlfriend. "'The actor is never liable . . . where [he] has done no more than to insist upon his . . . legal rights in a permissible way, even though he . . . is well aware that such insistence is certain to cause emotional distress.'" <u>Clift</u>, 688 A.2d at 813 (quoting <u>Restatement (Second) of Torts</u> § 46, comment g).

Having found that Norton failed to establish the first two elements of intentional infliction of emotional distress, we need go no further. The claim cannot prevail.

**IV.**

For the above reasons, we affirm the district court's grant of summary judgment.

**<u>Affirmed</u>**.

-20-