RICHARD BENEDICT KLOCKNER, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* FOR FRANCES MARION KLOCK-NER, AN INFANT, PLAINTIFFS-APPELLANTS, v. HARRY GREEN, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF EDYTH G. KLOCKNER, FORMERLY EDYTH RHODES GOODWIN, WILLIAM RHODES, ELIZABETH SYLVANIA, INDIVIDUALLY AND AS GUARDIAN FOR MARGARET RHODES, AN INCOMPETENT, AND CARO-LYN WOLF FIELD, DEFENDANTS-RESPONDENTS.

Argued May 6, 1969—Decided June 27, 1969.

232

*Mr. Sidney Finkel* argued the cause for plaintiffs-appellants.

*Mr. George Warren* argued the cause for respondent William Rhodes (*Mr. Lemuel H. Blackburn, Jr.,* of counsel; *Mr. Warren,* attorney).

*Mr. Frank H. Wisniewski* argued the cause for respondent Elizabeth Sylvania (*Mr. Wisniewski,* of counsel; *Messrs. Archer, Greiner, Hunter & Read,* attorneys).

The opinion of the court was delivered by

SCHETTINO, J.   Plaintiffs, Richard Klockner and Frances Klockner, the stepson and stepgranddaughter respectively of the late Edyth Klockner, brought suit to enforce an alleged oral contract between the deceased and the plaintiffs obligating the deceased to bequeath her estate to the plaintiffs in return for their services to her during her lifetime. Named as defendants were Harry Green, the executor of the estate, William Rhodes, Elizabeth Sylvania and Margaret Rhodes, the surviving next of kin of decedent, and Carolyn Wolf Field, a legatee under decedent's last executed will. (Carolyn Wolf Field did not answer nor appear in this case.)

At the conclusion of plaintiffs' case, the trial court granted defendants' motion to dismiss, holding that the proofs did not reveal the making of a contract because no offer and acceptance nor consideration had been established. The Appellate Division affirmed, holding that since there was no reliance by plaintiffs upon decedent's promise, the statute of frauds barred enforcement of that promise under *N. J. S. A.* 25:1–5. We granted certification. 53 *N. J.* 272 (1969).

Plaintiffs' uncontradicted proofs (as stated above, the motion to dismiss was granted before defendants introduced their case) established that Edyth Klockner, the deceased, and her husband, Richard Klockner's father, executed wills in favor of each other. Although her husband predeceased her, Edyth never revised her will. Accordingly, at her death, approximately three years later, her testamentary disposition had lapsed, and, but for this suit, the bulk of her estate would apparently pass by intestacy to her sole surviving relatives, defendants herein.

Richard Klockner's relationship with decedent, his stepmother, was like that of a natural child to his parent. He performed numerous services for her both before and after his father's death, doing as much and more than could be expected from even one's natural child. On an average, Richard attended to her needs once or twice a week from 1963 to her death in 1966.

Plaintiff, Frances Klockner (daughter of plaintiff, Richard Klockner), similarly spent much time with decedent, having a relationship more like that of mother and daughter than stepgrandmother and stepgranddaughter. Frances spent numerous nights with decedent when the latter felt fearful or alone, and also accompanied her on trips whenever she was needed.

In the early part of 1965 decedent approached Mr. Green, who had represented both her and her husband for many years, to discuss drawing a will. She indicated she wanted to leave her real property to Richard and her personal property to Frances. At Mr. Green's suggestion she prepared a

draft of a will, modeled after her earlier will, leaving the bulk of her estate to Richard and Frances. This draft was revised pursuant to suggestions from Mr. Green. Neither was ever executed, however.

Subsequently, in June 1965, decedent discussed with Richard the disposition of her estate. She informed him that she wanted to compensate him for being so helpful, and that if he would agree to continue to look after her and continue to let Frances visit her, she would leave the real property to him and the balance of the estate to Frances. Frances testified that the decedent discussed with her the understanding she had with Richard.

Decedent again contacted Mr. Green and informed him of the understanding she had with plaintiff regarding the disposition of her estate. Using decedent's second draft as a guide, Mr. Green redrafted her will and mailed it to decedent on November 24, 1965. Apparently because of decedent's belief that a will was a premonition of death, this draft remained unexecuted. Decedent became ill suddenly and died in February 1966, never having executed a will subsequent to the mutual will drawn with her husband in 1940.

Both the trial court and the Appellate Division held for defendants because, when questioned on cross-examination, both Richard and Frances testified that they would have continued to perform the services for decedent even if she had not made the promises to compensate them.

██ It is not disputed that a valid, enforceable contract can be made obligating a person to bequeath property in a specified manner. Accord *Davison v. Davison*, 13 *N. J. Eq.* 246 (*Ch.* 1861) (upholding a parol agreement to bequeath real estate in exchange for services); *Johnson v. Hubbell*, 10 *N. J. Eq.* 332 (*Ch.* 1855) (holding valid an oral agreement by a father to bequeath property in exchange for a son's conveyance of property to his sister). The question is: was such a contract entered into here?

Although we recognize that alleged agreements to make a particular disposition of one's estate must be subjected to

close scrutiny, we have no doubt that decedent here intended to obligate herself to bequeath her property to plaintiffs so long as they continued to serve her as they had prior to her promise. Such a promise, when acted upon, becomes a binding obligation. Decedent bargained for plaintiffs' services and obligated herself to bequeath the property to them when they performed. See 1 *Corbin, Contracts,* § 63 (1963).

■ The performance by plaintiffs need not have been induced solely by the offer of compensation. In the *Restatement of Contracts,* § 55 (1932), it is indicated that if an act is requested by the offeror as consideration for a unilateral contract, the act need only be given with the intent of accepting the offer. The examples which illustrate that rule clearly encompass the instant case.

"A offers a reward for information leading to the conviction of a criminal * * *. B, * * * induced by motives of fear or public duty, would have given the information without hope of reward, but as there is an offer of reward he intends when he gives the information to accept the offer. There is a contract."

In the only New Jersey case discussing this rule, the Court of Errors and Appeals noted that once the contract has been legally concluded, in giving effect to that contract "the motive which induced the party to make the contract or perform it must always be immaterial." *Mayor, etc. of Hoboken v. Bailey,* 36 *N. J. L.* 490, 497 (*E. & A.* 1873). See also 1 *Corbin, Contracts,* § 58 (1963) (recognizing the complexity of motivating causes in human action); *Restatement 2d, Contracts* § 55 (Tent. Draft No. 1, April 13, 1964) and § 84 (Tent. Draft No. 2, April 30, 1965).

■ In reviewing the facts of the instant case for purposes of the motion for judgment of dismissal, we must accept as true all the evidence which supports the view of the party against whom the motion is made, and should give him the benefit of all legitimate inferences which may be drawn in his favor. *DeRienzo v. Morristown Airport Corp.,* 28 *N. J.* 231 (1958); *Cauco v. Galante,* 6 *N. J.* 128 (1951).

■ We have no doubt that in the instant case a valid contract was entered into between plaintiffs and Edyth Klockner. Nothing in Richard's testimony indicated that he did not intend to accept the offer notwithstanding his statement that he would have served his stepmother anyway. The testimony of Frances similarly reveals no rejection of the offer despite a similar statement. These statements were merely the normal expressions of affection which naturally flow from the type of relationship which existed between plaintiffs and decedent.

The evidence also fully supports the existence of a bargain by decedent and her belief that she had contracted with plaintiff. Her attempt to execute a will (stymied only by her superstitions), and the testimony of her attorney, while not conclusive, present strong evidence of her intent to carry out her end of the bargain. See *Laune v. Chandless,* 99 *N. J. Eq.* 186 (*Ch.* 1926) (where the court interpreted the evidence of decedent's attempt to execute a will as indicative of decedent's belief that he had a moral and legal obligation to satisfy the contract); *Vreeland v. Vreeland,* 53 *N. J. Eq.* 387 (*Ch.* 1895) (where testimony and an undelivered deed were deemed sufficient corroboration of the alleged contract).

■■ Regardless of the apparent existence of a contract, the Appellate Division nevertheless affirmed on the basis that the statute of frauds barred enforcement of the contract. We do not agree that the contract is unenforceable. The rule that a statute of frauds should not be used to work a fraud is well settled. Oral contracts which have been performed by one party are frequently enforced where to do otherwise would work an inequity on the party who has performed. Thus, the cases hold that such performance takes the contract out of the statute of frauds. *E.g., Poloha v. Ruman,* 137 *N. J. Eq.* 167 (*Ch.* 1945) (specifically enforcing parol agreement to leave plaintiff her home if plaintiff would continue to care for decedent and her husband), *affirmed per curiam* 140 *N. J. Eq.* 396 (*E. & A.* 1947);

*Davison v. Davison, supra* 13 *N. J. Eq.* 246 (holding that plaintiff's part performance took the oral contract out of the statute of frauds).

Nevertheless, to obtain specific performance, as is requested here, more than just full performance by plaintiffs is necessary. As stated in *Cooper v. Colson*, 66 *N. J. Eq.* 328, 332 (*E. & A.* 1904), that performance must be in some respects of an exceptional character, and it must be obvious that not only did the parties not intend to measure the services by ordinary pecuniary standards, but that also the services are of such peculiar character that it is impossible to estimate their value by any standard. Accord *Poloha v. Ruman, supra* 137 *N. J. Eq.* 167, *affirmed per curiam* 140 *N. J. Eq.* 396; and see cases cited Annotation, "Oral Land Contract — Part Performance," 101 *A. L. R.* 923, 1091 *n.* 89 (1936).

We have no doubt that specific performance is an appropriate remedy in the instant case. Plaintiffs were not related to decedent and, therefore had no obligation, either morally or legally, to serve her as they did. Nonetheless, in addition to the numerous instances when plaintiffs rendered services to decedent, they also bestowed upon her the care, affection, society and companionship one would expect from a close blood relative.

Who can value the worth to a lonely person of having a loved one available at the slightest moment of anxiety, or at the most trivial moment of need? The law furnishes no standard whereby the value of such services can be measured. It is incumbent on equity, therefore, to accept the estimate of their value made by the party requesting the services by decreeing specific performance of the agreement. Accord 49 *Am. Jur., Statute of Frauds,* § 529 (1943).

We also find no reason on the present record for penalizing plaintiffs because of their professed willingness to serve the widow. Plaintiffs have fully performed, and decedent has received the full benefit of her bargain. Because the decedent has received the full benefit of her bargain, the policy reasons justifying the development of the part per-

formance exception to the statute of frauds have been satisfied. Since at this stage of the proceedings there is no real doubt as to the existence of the contract, the courts should not allow defendants to use the statute of frauds as a device to work a fraud on both plaintiffs and the decedent who at no time gave any indication that her estate should go to someone other than the plaintiffs.

Our discussion of course assumes the truth of the testimony of the plaintiffs and the inferences most favorable to them. We do so, because, as stated at the outset, judgment was granted on motion at the close of plaintiffs' case. We of course do not intend by this opinion to suggest how the testimony should be viewed at the close of the entire case.

We reverse and remand for further proceedings not inconsistent with this opinion.

*For reversal and remandment* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For affirmance* — None.