**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4883-18T3

KATHLEEN M. MOYNIHAN,

     Plaintiff-Respondent/
     Cross-Appellant,

v.

EDWARD J. LYNCH,

     Defendant-Appellant/
     Cross-Respondent.

_____

Argued September 15, 2020 – Decided November 12, 2020

Before Judges Yannotti, Haas and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part Burlington County, Docket No. FM-03-0189-17.

Allison M. Roberts argued the cause for appellant/cross-respondent (The Deni Law Group, LLC, attorneys; Allison M. Roberts, of counsel; Aleida Rivera, on the briefs).

Angelo Sarno argued the cause for respondent/cross-appellant (Snyder Sarno D'Aniello Maceri & Da Costa

LLC, attorneys; Angelo Sarno, of counsel and on the briefs; Scott D. Danaher, on the briefs).

PER CURIAM

In this palimony action, defendant Edward J. Lynch appeals from a May 29, 2019 order that enforced a February 2014 written agreement (the Agreement) he entered with plaintiff Kathleen Moynihan. The court ordered defendant to: 1) satisfy the mortgage on a home in which the parties were joint tenants; 2) execute a general warranty deed to plaintiff upon satisfaction of the mortgage; 3) pay the property taxes on the property, and 4) make a $100,000 payment to plaintiff. The court also dismissed defendant's counterclaim seeking partition of the parties' former residence and enjoined plaintiff from dissipating assets from one of his bank accounts. Plaintiff cross-appeals from paragraph one of that same order in which the court dismissed her claim for palimony and concluded after a six-day trial that the oral and written promises made by defendant did not establish an entitlement to such relief.

After carefully reviewing the record and the applicable legal principles, we affirm in part, reverse and vacate in part, and remand for further proceedings. In sum, we conclude that as the Agreement was a "promise by one party to a non-marital personal relationship to provide support or other consideration for the other party, either during the course of such relationship or after its

2                                                                    A-4883-18T3

termination," it was necessary that it not only be memorialized in a written document but "made with the independent advice of counsel for both parties," as unambiguously required by the 2010 amendment to the Statute of Frauds, N.J.S.A. 25:1-5(h) (Amendment). Neither party sought attorney review and the Agreement is therefore unenforceable consistent with the clear and unambiguous requirement of that statutory provision.

We also disagree with the court's conclusion that the parties' agreement was nevertheless an enforceable contract akin to an agreement for orderly removal under Rule 6:6-6(b), or on any other basis. Finally, we vacate that portion of the order dismissing defendant's counterclaim sounding in partition as the court failed to issue appropriate Rule 1:7-4 findings necessary for appropriate appellate review and dissolve the court's restraint on defendant's ability to spend the funds in one of his bank accounts.

I.

The trial record establishes that plaintiff and defendant began dating in 1997. At the beginning of the relationship, plaintiff testified she had been in the process of an eight-year divorce proceeding with her then-husband and was living with her three children, all of whom were under twelve years old.

A-4883-18T3

Defendant was divorced and lived in New Hampshire with his twelve-year-old daughter.

In July 2000, plaintiff finalized her divorce. After plaintiff's ex-husband failed to pay the mortgage on their former marital home, plaintiff lost the home in the ensuing foreclosure proceedings. While plaintiff was initially awarded $4255 in monthly alimony, it was reduced in 2003 to approximately $1000 per month, and in 2011 plaintiff entered a consent order with her ex-husband to terminate the alimony payments.

Shortly after plaintiff's divorce, defendant purchased residential property in Bordentown at plaintiff's father's request where plaintiff subsequently lived with her children. At the time of the purchase, defendant's name was the only name on the deed. He subsequently acquired two mortgages on the property and paid certain carrying charges for the property, including homeowner's insurance. In connection with the purchase, plaintiff obtained a loan from her father to provide an $8000 down payment and also paid the mortgage and property taxes.

While defendant maintained his primary residence in New Hampshire, plaintiff claimed that beginning in approximately 2000 or 2001, he stayed at the Bordentown property more than he stayed at his New Hampshire residence. Although defendant would travel to New Hampshire once or twice a month and

4                                                          A-4883-18T3

plaintiff would sometimes accompany him, plaintiff stated that "he was primarily living with [her]" and that outside of his time in New Hampshire, he would spend the remainder of his time "[w]ith [her] in New Jersey."

On January 26, 2007, defendant created a trust (the Trust) in which he designated himself the trustee and plaintiff the successor trustee. The same day, defendant conveyed ownership of the Bordentown property by deed from himself to the Trust. Defendant also transferred his basic and optional life insurance policies into the Trust and designated the Trust as the primary beneficiary of his accidental death and dismemberment policy as well as his 401(k) account.

Defendant also designated plaintiff as the beneficiary of his bond account in 2013, and she remained the beneficiary for the duration of the parties' relationship. Finally, on April 10, 2013, defendant conveyed title of the Bordentown property from the Trust to plaintiff and defendant as joint tenants with rights of survivorship.

Plaintiff testified that throughout the relationship, she and defendant had a number of conversations about their future together in which defendant promised to support her financially. For example, plaintiff stated that defendant repeatedly promised that he was "going to take care of [plaintiff] for the rest of

5

[her] life," that he loved her, that they were "a family," and that they would have "a great retirement," although she noted she was frustrated by defendant's equivocations regarding shopping for an engagement ring. She also stated that defendant paid for her attorney during her divorce and influenced her to enter into the consent order terminating alimony because "he said he would take care of [her] for the rest of [her] life" and that the parties "would be together" because they "were a family and . . . didn't need" the alimony.

Plaintiff testified that when defendant placed the Bordentown property in the Trust, defendant promised that he would "take care of [plaintiff]" so she would never "have to worry if something happens to [him]." Plaintiff stated that defendant promised to support her for the rest of her life "a lot," including when she moved into the Bordentown property and when he named her a beneficiary on his life insurance policy and retirement account. On March 27, 2014, defendant sent plaintiff a text message stating: "I do love you and all I do is plan[] for your future[,] but you don't seem to realize that."

Plaintiff's daughters likewise testified that defendant, who each considered their stepfather, stated he would support plaintiff for the rest of her life. Plaintiff's older daughter Megan stated that when plaintiff would express concern about not having retirement savings, defendant "would say things like,

well, I don't know what you're worried about. I told you I would take care of you." Megan also described a conversation with defendant in which defendant did not understand "why [plaintiff was] so concerned about money because he has enough to take care of both of them" and that defendant "told her that he will take care of both of them." Plaintiff's younger daughter, Caitlyn, similarly testified that defendant told her that "he's a millionaire a couple of times over . . . [a]nd he said that [plaintiff] was already taken care of, that she should know that, that his retirement is her retirement," and that plaintiff "could retire today and she wouldn't have to worry."

In February 2014 plaintiff and defendant entered into the Agreement, handwritten by defendant, which was signed by both parties, and notarized. The Agreement provided that "[i]n the event that [plaintiff] and [defendant] terminate their relationship [defendant] agree[s]" that:

1. The home . . . in Bordentown[,] NJ will be paid off within five years after [defendant] vacates the property.

2. After paying off the mortgage note [defendant] will sign the Deed over to [plaintiff] thereby giving her sole ownership of said property.

3. Until the mortgage is satisfied [defendant] will pay the monthly mortgage payment.

7

4. [Defendant] will pay the property tax at . . . [the] Bordentown[, NJ property] for two years after his departure.

5. [Defendant] will pay [plaintiff] a sum of $100,000 dollars by the end of a five[-]year[] period starting when [defendant] vacate[s] the [Bordentown] property.

This agreement finalizes all obligations of [defendant] to [plaintiff].

Although the Agreement was not dated, the court accepted defendant's testimony that it was executed in February 2014.

Plaintiff testified that she did not request that defendant draft the Agreement and "didn't even know he was doing it." When plaintiff requested that an attorney review the Agreement, defendant purportedly replied that "he didn't want to pay a lawyer" because "if I tell you I'm going to do something, I'm going to do it. I'm a man of my word." Defendant also informed plaintiff that "getting it notarized is as good as going to an attorney. It makes it legal."

Defendant, on the other hand, testified that he did not intend to be bound by the Agreement at the time he signed it. He acknowledged that his actions were "dishonest" because he never informed plaintiff that he did not intend to be bound, and that he didn't "know what she was thinking" regarding the enforceability of the Agreement. Plaintiff and defendant ultimately signed the

Agreement before a notary without either engaging an attorney to conduct an independent review.

The parties' relationship deteriorated throughout 2013 and 2014 and ended in April 2015 when defendant vacated the Bordentown residence. Initially, defendant continued to pay the mortgage and property taxes. On July 6, 2015, however, in response to a text message in which plaintiff sent defendant a tax bill due on August 1, 2015, defendant stated "I'm not paying it[.] [A]s far as I'm concerned[,] we don't have an agreement anymore[.] I'll pay the mortgage you live there you pay the taxes."

On August 11, 2015, plaintiff filed a complaint seeking enforcement of the Agreement and attorneys' fees. On November 18, 2016, the trial court granted plaintiff's requests to file an amended complaint and to restrain defendant from dissipating certain of the parties' joint assets. It denied, however, defendant's requests to dismiss the complaint and to force a sale of the Bordentown property because such relief lacked "a sufficient factual or legal basis."

In her eleven-count amended complaint, plaintiff sought relief based on the following causes of action: 1) palimony, 2) enforcement of a written contract, 3) enforcement of an oral contract, 4) partial performance as a bar to

A-4883-18T3

the Statute of Frauds, N.J.S.A. 25:1-5, 5) unjust enrichment, 6) quantum meruit, 7) quasi-contract, 8) equitable estoppel, 9) specific performance of an implied contract, 10) fraud or misrepresentation, and 11) joint venture. Defendant filed an amended answer and a counterclaim for partition of the Bordentown property.

A trial took place over six nonconsecutive days. Plaintiff and her daughters Megan and Caitlyn testified on her behalf, and she also called defendant in her direct case. Contrary to plaintiff's testimony and that of her daughters, defendant testified that the relationship was "exclusive" but that it was "not marriage-like." He similarly stated that he did not consider his relationship with plaintiff as "family" or a "family unit."

Defendant contended that the Agreement was unenforceable "[b]ecause there were other agreements. This was a work in progress." He admitted, however, that no other such agreements were provided in discovery. He also stated that "[n]o promise of anyone has ever passed my lips, not my daughter, not my parents, that I'd take care of them for the rest of their lives," though he testified that he drafted the Agreement and added plaintiff as a life insurance beneficiary to "shut her up."

During trial, plaintiff moved for temporary restraints freezing a bank account defendant owned. The court granted plaintiff's request and entered a

corresponding order concluding that plaintiff satisfied each factor of the Crowe v. De Gioia, 90 N.J. 126 (1982), test. The court specifically determined that plaintiff would suffer irreparable harm if the account was not frozen because defendant might have been "trying to hide [h]is assets and dodge his obligation." The court further reasoned that plaintiff presented an issue on which she was likely to succeed in that she presented "a prima facie case of merit." Finally, it concluded that no hardship would result to defendant and that there was potential hardship to plaintiff because any potential judgment may be rendered uncollectible without those assets.

At the conclusion of plaintiff's case, defendant moved for judgment under Rule 4:40-1 on the palimony and written contract counts. Defendant argued that pursuant to the Amendment, a written contract for palimony is not "binding unless it was made with the independent advice of counsel . . . to both parties," and that neither party in this case consulted an attorney prior to signing the Agreement. In response, plaintiff argued that the Amendment was unconstitutional because it impaired the "right of his client and people situated similarly to his client to enter into contracts." Plaintiff further maintained that there was no reason "for people who are in a . . . marital type relationship who

11

want to enter into a contract to resolve their relationship should have to have an attorney when nobody else has to have an attorney."

The court concluded that there was no factual dispute as both parties were "very clear[] that they did not talk to an attorney with regard to [signing the Agreement]." The court declined to conclude that the Amendment was unconstitutional because: 1) there was "no notice to the Attorney General of the attack on the validity of the statute" as required by Rule 4:28-4(a)(1); 2) the Supreme Court declined to address the constitutionality of the Amendment in Maeker v. Ross, 219 N.J. 565 (2014); and 3) there was "no evidence . . . of any kind of undue burden . . . [or] evidence that it impairs [plaintiff's] right to contract . . . [or to] afford an attorney." While the trial court found the policy discussions around palimony "smacks a . . . bit of paternalism and patriarchy," the court noted it was bound by the plain language of the statute and granted defendant's motion with regard to count one for palimony and dismissed that claim with prejudice.

Turning to defendant's request for judgment on the enforceability of the Agreement, the court found that it is "simply a contract between the[] parties" requiring only an offer, acceptance, and consideration. The court noted that the parties negotiated at length the provisions of the Agreement and that there was

a "meeting of the minds." The court found consideration existed based on "the love and affection between the parties, the years that they were together" and denied defendant's motion. After the court dismissed count one, the trial proceeded on counts two through eleven and defendant's counterclaim for partition.

At the conclusion of trial, the court issued a May 29, 2019 order dismissing all the remaining counts in the amended complaint except for count two, enforcement of the Agreement. It ordered defendant to "completely satisfy" the mortgage at the Bordentown property, issue a general warranty deed to plaintiff upon satisfaction, pay plaintiff $100,000, and pay all property taxes on the property between May 1, 2015, and April 30, 2017. The court denied plaintiff's requests for "an equitable legal share of the assets accumulated by the [d]efendant during the relationship" and "that the [d]efendant provide proper support for her." Further, it continued the previously entered restraint on defendant's bank account and ordered the parties to pay their own attorneys' fees and costs. Finally, the court dismissed defendant's counterclaim.

In its corresponding May 29, 2019 oral opinion, the court found that "between 1997 and 2000, [the parties] were engaged in . . . a dating relationship. And it wasn't until the property in Bordentown was purchased that it became

13

more frequent, more formalized, and could more accurately be called cohabit[at]ing, or at least living together." It also found that the parties did not commingle funds in the form of a joint bank account or joint credit cards, which was undisputed.

The court noted the discrepancies between the parties' view of the relationship. The court concluded that defendant's testimony was not "particularly credible" and that plaintiff's testimony was "much more credible than the [defendant's] . . . in all respects." The court noted that his testimony in which he stated he "never intended to be bound by" the Agreement and that "[h]e did it to keep the peace" was detrimental to his credibility, as well as his evasive responses to questioning about "the use of the money from the sale of the bonds." The court found that the relationship "[c]learly . . . was a cohabitation and certainly had all of the earmarks of a marital style relationship and a family style relationship."

The court then described the promises that plaintiff alleged were made to her by defendant "to support her for the rest of her life." It concluded that despite its finding that plaintiff was "generally more credible than the defendant," the court found the defendant did not tell plaintiff that he would "take care of [her] for the rest of [her] life" in 2000. The court also found that when defendant

agreed to pay the mortgage and taxes on the Bordentown property, "it [wa]s not a situation in which he was agreeing to support or take care of her for any period of time. He was simply acting as a means for her to live in a townhouse instead of an apartment."

After considering the parties' discussions of marriage, the Trust, and defendant's bill payments, the court was "unable to conclude" that those discussions "amount[ed] to an express agreement of support for life" and that "[i]t was simply the various financial machinations that went on between [defendant] and [plaintiff] during the course of their relationship." As such, the court denied plaintiff's request for palimony based on any purported oral agreement. The court also reaffirmed its earlier decision denying palimony based on the Agreement as contrary to the Statute of Frauds.

The court next addressed plaintiff's claims in count two of the amended complaint for enforcement of the Agreement. Specifically, the court determined that "it is more likely" that the Agreement was signed in 2014 as defendant testified. It concluded that the Agreement's terms were "clear and understandable, and they were understood by the parties." It further found that the Agreement was in defendant's handwriting and was "the culmination of various discussions that the parties had about their relationship, what they were

doing, where they were going, [and] what they wanted in the future." The court found not credible defendant's "testimony that there were other agreements in writing" because he produced no other prior agreements, and it accordingly determined that the Agreement was "the only written agreement that exist[ed] between the plaintiff and the defendant."

The court further concluded that "[w]hile the proofs do not support a finding of a promise by the defendant to support the plaintiff for life, . . . [they] do support the conclusion that . . . the defendant wanted the plaintiff to have the house." Further, it determined that "[t]he conclusion is inescapable that [the Agreement] is a contract between the plaintiff and the defendant" which was legally enforceable. Noting that consideration was the only element of contract formation in dispute, the court found that "plaintiff gave up her alimony in 2011, upon the representation by the defendant that [he] would take care of her" and also induced her "to remain in the relationship." The court concluded that despite defendant's motive "to shut [plaintiff] up" and "to make her feel secure," he clearly acknowledged that "he knew there was an agreement" because of his text message stating "[w]e don't have an agreement anymore."

The court reasoned that the Agreement "clear[ly]" was not a palimony agreement because "there is no promise in it of support for the rest of [plaintiff]'s

life."  Rather, the court found the Agreement was "very akin to an order for orderly removal that we see in landlord/tenant court all of the time."  Because it was unaware "of any prohibition in the law on the rights of parties who are cohabiting to enter into these types of agreements," it granted plaintiff's request for relief in count two, enforcement of the written agreement.  Finally, it dismissed all remaining counts of the complaint "as they are actually alternative theories of liability in the event the oral and/or written agreements [were] not enforced" as well as defendant's counterclaim for partition.[1]  This appeal followed.

On appeal, defendant argues that the trial court should have dismissed count two, as the parties did not consult attorneys pursuant to the Amendment.

---

[1]  As noted, plaintiff's amended complaint also included claims for: unjust enrichment (count five), quantum meruit (count six), quasi-contract (count seven), equitable estoppel (count eight), specific performance of an implied contract (count nine), fraud or misrepresentation (count ten), and joint venture (count eleven).  Significantly, plaintiff's notice of cross-appeal clearly states she seeks review of only paragraph one of the order, which dismissed count one of the amended complaint.  It is well settled that a party's appeal is limited to those judgments or orders, or parts thereof, designated in the notice of appeal. Pressler & Verniero, Current N.J. Court Rules, cmt. 6.1 on R. 2:5-1 (2020).  Further, plaintiff failed to brief the propriety of the trial court's dismissal of these claims. The failure to brief an issue constitutes waiver of that issue.  See Gormley v. Wood-El, 218 N.J. 72, 95 n.8 (2014); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2020).  We therefore decline to consider any challenge to the portion of the court's May 29, 2019 order that dismisses counts five through eleven.

Further, he contends that the court erred by concluding that the Agreement was legally enforceable as similar to an agreement for orderly removal. Moreover, defendant claims the court erred by dismissing his counterclaim for partition and in continuing the freeze on his bank account.

In her cross-appeal, plaintiff argues that the trial court committed error when it concluded that defendant did not make oral promises of palimony. Alternatively, she contends the court erred by failing to conclude that partial performance nullified the Amendment's attorney review requirement. Finally, plaintiff argues the court erred when it determined the Amendment was not an unconstitutional infringement on her contractual rights.

## II.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We generally defer to factual findings made by a trial court when such findings are supported by adequate, substantial, and credible evidence. Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We review the Family Part judge's findings in accordance with a deferential standard of review, recognizing the court's 'special jurisdiction and expertise in family matters.'" Thieme v. Aucoin-Thieme, 227 N.J. 269, 282-83 (2016) (quoting Cesare, 154 N.J. at 413). "A more exacting standard governs our review of the trial court's

legal conclusions[,] . . . [which] we review . . . de novo." Ibid. (citing D.W. v. R.W., 212 N.J. 232, 245-46 (2012)).

## III.

Defendant initially argues that the court committed error when it concluded that because the Agreement had "no promise in it of support for the rest of [plaintiff's] life," it was "beyond the reach of the Amendment." We agree.

Palimony is "a claim for support between unmarried persons." Devaney v. L'Esperance, 195 N.J. 247, 253 (2008). "A valid cause of action for palimony requires an agreement to pay future support made during a marital-type relationship between unmarried persons." Bayne v. Johnson, 403 N.J. Super. 125, 139 (App. Div. 2008). The common law elements of a palimony cause of action are that: 1) the parties cohabited; 2) in a marriage-type relationship; 3) during which defendant promised plaintiff support for life; and 4) there was valid consideration for the promise. Levine v. Konvitz, 383 N.J. Super. 1, 3 (App. Div. 2006).

Prior to the enactment of the Amendment, palimony agreements could be express or implied. Kozlowski v. Kozlowski, 80 N.J. 378, 384 (1979). Further, in In re Estate of Roccamonte, 174 N.J. 381, 393 (2002), our Supreme Court concluded that "the entry into [a marital-type] relationship and then conducting

19

oneself in accordance with its unique character is consideration" to enforce a promise for support.

The existence and terms of the contract in a palimony action are not determined by the parties' words, but "by the parties' 'acts and conduct in the light of . . . [their] subject matter and the surrounding circumstances.'" McDonald v. Estate of Mayety, 383 N.J. Super. 347, 359 (App. Div. 2006) (quoting Kozlowski, 80 N.J. at 384). A general promise of support for life in exchange for some consideration is sufficient to form a contract. Ibid. When the court determines that such a promise was made and later broken, it will award the promisee a lump sum payment representing the present value of reasonable future support over the expected life of the promisee. Id. at 360.

The Statute of Frauds requires that certain "agreements or promises . . . be in writing and signed by the party to be charged therewith." N.J.S.A. 25:1-5. On January 18, 2010, the Statute of Frauds was amended to include the Amendment, which as noted, required that palimony agreements be in writing and entered with the advice of counsel. L. 2009, c. 311, § 1, eff. Jan. 18, 2020. Specifically, the Amendment provides that an agreement must be in writing where there is a:

> promise by one party to a non-marital personal relationship to provide support or other consideration

for the other party, either during the course of such relationship or after its termination. <u>For the purposes of this subsection, no such written promise is binding unless it was made with the independent advice of counsel for both parties.</u>

[N.J.S.A. 25:1-5(h) (emphasis added).]

The legislative history of the Amendment makes clear that the Legislature "intended to overturn recent 'palimony' decisions by New Jersey courts," specifically referencing <u>Devaney</u>, 195 N.J. at 248 (holding "cohabitation is not an essential requirement for a cause of action for palimony, but a marital-type relationship is required"); <u>Roccamonte</u>, 174 N.J. at 381 (holding that a promise of support between unmarried persons may be enforced against a decedent's estate); and <u>Kozlowski</u>, 80 N.J. at 378 (recognizing that a promise between unmarried persons for support, whether express or implied, may be enforceable). <u>Senate Judiciary Committee</u>, Statement to S.2091 (Feb. 9, 2009).[2]

---

[2] Then Governor Jon S. Corzine issued the following statement when he signed the legislation.

> I approve Senate Bill No. 2091 . . . in light of the representation by legislative leadership and the bill sponsors that this law will be improved to recognize agreements or promises in a non-marital relationship as binding when they are mutual, in writing, and notarized as opposed to mandating the involvement or services of an attorney. Legislative leadership and the sponsors

Here, the trial judge incorrectly concluded that because the Agreement lacked an essential element of a palimony agreement, a promise of support for life, it fell outside of the Statute of Frauds. The Amendment, however, requires only that such an agreement contain a "promise by one party to a non-marital personal relationship to provide support or other consideration for the other party, either during the course of such relationship or after its termination." N.J.S.A. 25:1-5(h). The Amendment does not limit the attorney review requirement to promises of support for the promisee's life or any other duration of time. As such, the trial court erred when it concluded that because the Agreement lacked a promise of support for life, it stood outside the clear requirements of the Amendment.

share my goal of providing greater clarity in the enforcement of palimony agreements but ensuring that this law does not have an adverse impact on parties who may not be able to afford the services of an attorney. I take this action in light of the time constraints that result at the end of a legislative session, which do not afford time for a [c]onditional [v]eto to recommend removal of this provision.

Despite Governor Corzine's intention that the law be amended to require only a notarized agreement, no such modifying amendment was ever enacted by the Legislature.

By way of the Agreement, defendant clearly promised "to provide support or other consideration" to plaintiff. In this regard, defendant stated, despite any unexpressed intentions he may have had, that he would agree to the terms of Agreement in the event the relationship terminated. And, he agreed that should such an event occur, he would pay the entirety of the mortgage at the Bordentown property within five years, sign the deed over to plaintiff, pay the monthly mortgage, pay the property taxes for two years, and pay plaintiff a lump sum of $100,000 within five years after he vacated the property. The Agreement is precisely the type of written contract encompassed by the Amendment and for which attorney review is required. Absent compliance with the Amendment, the Agreement is not an enforceable contract.

IV.

We also agree with defendant that the court erred when it enforced the Agreement as a non-palimony contract. The court equated the Agreement to a landlord/tenant order for orderly removal specifically stating that the Agreement was "very akin to an order for orderly removal" and that "that's exactly what this is."

Under Rule 6:6-6(b),

> [a]n application for orderly removal requesting more time to move out, if there is a showing of good reason

23

and applied for on notice to a landlord . . . need not have a return date if the sole relief is a stay of execution of a warrant of removal for seven calendar days or less, but it shall provide that the landlord may move for the dissolution or modification of the stay on two days' notice to the tenant or such other notice as the court sets in the order.

It is clear from a plain reading of Rule 6:6-6(b) that the Agreement bears no similarity to an order for orderly removal. Rule 6:6-6(b) orders do not distribute funds, compel payments based on alleged offers of support, or transfer contested interests in real property. Furthermore, as we have already concluded that the Agreement was clearly encompassed by the Amendment, it was error for the court to enforce the Agreement under another name. Finally, there is no evidence to support a finding that the parties entered into a landlord/tenant relationship. In light of our decision, we need not address defendant's related argument that the Agreement was unenforceable for a lack of consideration.

V.

Plaintiff further argues that her partial performance in accordance with the purported oral promises warrants enforcement of the Agreement. We disagree for the following reasons.

First, we find that plaintiff did not plead a proper cause of action for partial performance. Indeed, count four of plaintiff's amended complaint states that it

24                                                                                          A-4883-18T3

was defendant, not plaintiff, who partially performed. As the Supreme Court noted in Klockner v. Green, a plaintiff alleging partial performance as an exception to the Statute of Frauds must base their claim on their own performance, not the defendant's. 54 N.J. 230, 236-37 (1969). We therefore find that plaintiff's pleading does not support a basis for relief as it is based on the performance of defendant and not on her own. Even if we considered the amended complaint to conform to the proofs as permitted by Rule 4:9-2, we also reject plaintiff's argument because her claim for partial performance is in direct contradiction to the Amendment and the services performed are not exceptional in character.

In Maeker, we questioned whether an oral palimony agreement can be enforced based on a claim for partial performance. 430 N.J. Super. at 93. After reviewing the legislative history to the bill enacting the Amendment, we noted the Legislature expressed its intent that the bill was "intended to overturn recent 'palimony' decisions by New Jersey courts." Ibid. (quoting Senate Judiciary Committee, Statement to S.2091 (Feb. 9, 2009)); see also Devaney, 54 N.J. at 248; Roccamonte, 174 N.J. at 381; Kozlowski, 80 N.J. at 378.[3]

_____

[3] In Roccamonte, the Supreme Court upheld an oral promise for palimony for a twenty-five-year relationship. 174 N.J. at 385. The Court held that although it

Plaintiff's claim of partial performance is contrary to the clear terms of the Amendment. Indeed, plaintiff's theory of relief is of the type that was specifically intended to be barred by the Amendment. As noted, the Amendment was enacted by the Legislature in direct response to recent decisions that found implied in fact agreements. Roccamonte, 174 N.J. at 395; Kozlowski, 80 N.J. at 384. A contract implied in fact is created by the conduct of the parties. Weichert Co. Realtors v. Ryan, 128 N.J. 427, 436 (1992). Plaintiff's assertion that the Agreement should be enforced based on her alleged partial performance of an oral agreement between the parties, would essentially permit enforcement of contract the Legislature has expressly prohibited.

Finally, in Maeker we noted that to grant the equitable remedy of specific performance of an oral promise the "performance must be in some respects of an exceptional character, and it must be obvious that . . . the services are of such peculiar character that it is impossible to estimate their value by any standard." 430 N.J. Super. at 94 (quoting Klockner, 54 N.J. at 237). We rejected the requested equitable relief in that case because "there was nothing exceptional or

believed an oral promise existed, the agreement would also have been enforceable by implication. Id. 395. In Kozlowski, the Supreme Court upheld an oral promise for palimony for a fifteen-year relationship. 80 N.J. at 384-87. Moreover, similar to Roccamonte, the Court found that it was "of no legal consequence" whether the promise was express or implied. Id. at 384.

26

peculiar about the services performed by defendant, and plaintiff, as well as her son, already received the full benefit of those services." Ibid. These services included paying for joint property expenses, plaintiff's living expenses, and plaintiff's son's living expenses. Id. at 93. Here, without minimizing plaintiff's contributions to the parties' relationship, like in Maeker, the services were not "exceptional or peculiar in character" and did not support enforcement of the Agreement.

## VI.

In addition, defendant asserts that the court erred by dismissing his counterclaim for partition without placing its reasons for dismissal on the record. He further contends that his partition claim was meritorious as his rights as a joint tenant of the property would be violated without a partition because it is the deed that governs, not the Agreement. We agree with defendant that he asserted a viable partition claim. As the court dismissed that cause of action without providing a statement of reasons as required by Rule 1:7-4, we vacate that portion of the May 29, 2019 order and remand for further proceedings.

Partition is an equitable remedy by which property, held by at least two people or entities as tenants in common or joint tenants, may be divided. See N.J.S.A. 2A:56-1 to -44; R. 4:63-1. When property is subject to partition, a

physical division of the property is one possible remedy.  N.J.S.A. 2A:56-2 provides that a court "may, in an action for the partition of real estate, direct the sale thereof if it appears that a partition thereof cannot be made without great prejudice to the owners, or persons interested therein."  The manner in which property is partitioned is "within the discretion of the court."  Greco v. Greco, 160 N.J. Super. 98, 102 (App. Div. 1978) (citing Newman v. Chase, 70 N.J. 254, 263 (1976)).

Rule 1:7-4(a) provides that the court "shall . . . find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of right."  "Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion.  In the absence of reasons, we are left to conjecture as to what the judge may have had in mind."  Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990); see also Estate of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 301 (App. Div. 2018).

At trial, defendant established a colorable partition claim.  For example, on April 10, 2013, title of the Bordentown home was conveyed from the Trust by deed to defendant and plaintiff as joint tenants with rights of survivorship. Defendant was responsible for certain of the property's carrying costs.  For her

part, plaintiff contributed an $8000 loan from her father to be used as a down payment.

Here, the court summarily stated that as a result of granting count two and enforcing the Agreement, "the counterclaim is dismissed." We cannot discern from this statement the court's reasoning to support the dismissal of defendant's counterclaim. A remand is therefore necessary for the court to consider the trial proofs and address the partition claim with appropriate Rule 1:7-4 factual findings and legal conclusions.

## VII.

Defendant also contends that the trial court erred by continuing the freeze on his bank account until "all of the obligations under [the trial court's order] are satisfied," and again stressed that the court failed to make necessary factual findings and legal conclusions supporting the need for continuing restraints. As we have reversed that portion of the May 29, 2019 order that enforced the Agreement and remanded for further proceedings limited to the partition action, we discern no further need for the restraints on defendant's bank account under Crowe, 90 N.J. at 132-34. Accordingly, the portion of the trial court's order freezing defendant's bank account is vacated.

## VIII.

On her cross-appeal, plaintiff contends that the trial court committed error in dismissing her claim for palimony stated in count one because it "failed to adequately consider [d]efendant's conduct when deciding whether any oral promises existed." We disagree.

In Maeker v. Ross, we held that because palimony actions are based upon principles of contract law, a palimony cause of action accrues at the time the defendant is alleged to have breached the agreement, not at the time the promise of lifetime support was purportedly made. 430 N.J. Super. 79, 97 (App. Div. 2013). In 2014, however, the Supreme Court reversed our ruling and held that the Amendment did not apply retroactively to void oral palimony agreements that predated its enactment. Maeker, 219 N.J. at 580-82. The Supreme Court explained that the date the oral contract was formed, rather than the date the cause of action accrued, was the controlling date "for retroactivity purposes." Id. at 582. Under the Supreme Court's holding, count one of plaintiff's amended complaint, predicated on alleged oral promises made during their eighteen-year relationship, pre-dated the Amendment and was therefore enforceable so long as oral promises of palimony existed.

A-4883-18T3

As noted, the common law elements of a palimony cause of action are that: 1) the parties cohabited; 2) in a marriage-type relationship; 3) during which defendant promised plaintiff support for life; and 4) there was valid consideration for the promise. Levine, 383 N.J. Super. at 3. Plaintiff contends that the only element at issue is whether defendant made oral or written promises for support. In this regard, plaintiff relies on In re Estate of Quarg for the proposition that a "promise will be enforced by the court whether it is oral or written, implied or express, or inferable from the parties' acts and conduct rather than by what they said." 397 N.J. Super. 559, 564 (App. Div. 2008) (citing Roccamonte, 174 N.J. at 389).

In Quarg, this court remanded the matter "to the Chancery Division for a plenary hearing, if necessary, to determine whether [the plaintiff] can establish an enforceable implied promise as detailed in Roccamonte" regarding her request for a constructive trust. Id. at 566. In reaching its decision, the court concluded that an implied promise may have existed because "one of the components of [plaintiff]'s complaint alleged that she would be unjustly impoverished if she did not share in [defendant]'s estate" and because "after more than forty years of living with [defendant] as married, [plaintiff] asserts that the relationship was 'founded on mutual trust, dependency[,] and raised

31

expectations.'"  Ibid.  In this regard, the court found that the plaintiff's "allegations bespeak an implied promise by [defendant] not to leave [plaintiff] impoverished, but rather, to see to it, as best he could, that she survived with adequate provisions during the remainder of her life."  Ibid.

Here, as noted, we typically afford substantial deference to Family Part factual findings because of its "special jurisdiction and expertise," see Thieme, 227 N.J. at 283 (quoting Cesare, 154 N.J. at 413), and we find no reason to deviate from that standard of review and disrupt that portion of the trial court's credibility-based finding that defendant never made an "implied or express oral promise that he would support the plaintiff either for her life or for any other period of time."  The court's conclusion was supported by substantial credible evidence in the record.

Further, unlike the parties in Quarg, plaintiff and defendant did not share a last name and had no joint bank account.  And, as the trial court noted, "[w]hen the defendant set up the revocable trust, he told [plaintiff] what it meant.  She understood that it was revocable, that he could change it at any time."  Moreover, unlike Quarg, the court noted that "during all of this time, up to and including the present, the plaintiff is not totally dependent on the defendant," and that the case law indicates that "complete financial dependence . . . is one thing that we

32

can look at."  Subsequently, the court found that "[plaintiff] [had] work[ed] and receiv[ed] for a period of time, child support, and receiv[ed] . . . alimony."  Here, there is no indication that plaintiff would be "impoverished" absent the enforcement of an oral promise of palimony.  See Quarg, 397 N.J. Super. at 566.  In sum, the trial court did not err when it dismissed count one and concluded that defendant's conduct did not evince an implied oral promise to support plaintiff for life or other period of time.

## IX.

Finally, plaintiff argues that the Amendment violates the Contract Clause of the New Jersey and United States Constitutions.  She contends that "there can be no doubt that there is a contractual relationship between [p]laintiff and [d]efendant, and between individuals similarly situated," which has been impaired because it leaves plaintiff "without adequate recourse after dedicating a large part of her life to [d]efendant."  She further maintains that the independent legal counsel requirement "lacks a significant and legitimate public purpose" because it "prohibits parties who cannot afford to retain counsel from entering into an enforceable agreement" and no other statute "requir[es] parties to consult with independent legal counsel, as opposed to affording parties the opportunity to consult with" same.  Finally, she claims that "the requirement of

independent legal counsel is based upon unreasonable conditions and is unrelated to appropriate governmental objectives." We disagree with all of these arguments.

The Contract Clause of the United States Constitution states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. 1, § 10, cl. 1. Similarly, New Jersey's Constitution guarantees: "The Legislature shall not pass any . . . law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made." N.J. Const. art. IV, § 7, para. 3; see, e.g., Berg v. Christie, 225 N.J. 245, 258-59 (2016); Burgos v. State, 222 N.J. 175, 193 (2015).

"Contract impairment claims brought under either constitutional provision entail an analysis that first examines whether a change in state law results in the substantial impairment of a contractual relationship and, if so, then reviews whether the impairment nevertheless is 'reasonable and necessary to serve an important public purpose.'" Berg, 225 N.J. at 259 (quoting U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 25 (1977)). Our Supreme Court has advised this analysis requires "three inquiries." Ibid. "Legislation unconstitutionally impairs a contract when it (1) 'substantially impair[s] a contractual relationship,' (2) 'lack[s] a significant and legitimate public purpose,' and (3) is 'based upon

unreasonable conditions and . . . unrelated to appropriate governmental objectives.'" Burgos, 222 N.J. at 193-94 (quoting Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 546-47 (2013) (alterations in original)).

Here, requiring a lawyer to review palimony agreements is not a substantial impairment. The Legislature routinely imposes additional costs on parties who seek to enter contractual relationships. For example, it has required independent legal counsel if a lottery winner seeks to assign their winnings. See N.J.S.A. 5:9-13(d)(15). Further, in the rare situations in which courts have found a substantial impairment, the law in question has completely altered terms of an existing, enforceable contract. See, e.g., Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 247 (1978) (finding a substantial impairment because the "statute in question . . . nullifie[d] express terms of [a party's] contractual obligations and impose[d] a completely unexpected liability in potentially disabling amounts"). Plaintiff and others similarly situated are free to enter enforceable palimony agreements so long as they satisfy the Statute of Frauds. Here, plaintiff conceded that she chose not to see a lawyer about the Agreement and the trial court found there was "no evidence she c[ould not] afford an attorney."

Moreover, the Amendment's conditions reasonably relate to a significant and legitimate public purpose. The Statute of Frauds exists because the Legislature has found agreements within its scope "susceptible to fraudulent and unreliable methods of proof." Lahue v. Pio Costa, 263 N.J. Super. 575, 599 (App. Div. 1993). With regard to the Amendment specifically, we noted that the Legislature was concerned with the burden of proof difficulties in establishing valid palimony agreements. While independent attorney review is not required in other provisions of the Statute of Frauds or other family law agreements, the Legislature has required so for palimony agreements with the very purpose of protecting the rights of contracting parties. The Amendment is one legitimate way of addressing this significant issue and is reasonably related to appropriate legislative objectives. After considering the aforementioned three-part inquiry, we conclude plaintiff has failed to establish that the Amendment violates the Contract Clauses of the State or Federal Constitutions.

To the extent we have not addressed any of the parties' arguments it is because we find them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed and vacated in part, and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4883-18T3